1

2

3                                                                    O

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10   RONALD LEE DEERE,              )    CASE NO. CV 92-1684 CAS
                                    )
11          Petitioner,             )    **DEATH PENALTY CASE**
                                    )
12          v.                      )
                                    )    ORDER GRANTING IN PART
13   VINCE CULLEN,[*] Warden of     )    PETITION FOR WRIT OF
     California State Prison at San )    HABEAS CORPUS
14   Quentin,                       )
                                    )
15          Respondent.             )
                                    )
16                                  )

17   ————————————————————

18          Petitioner Ronald Deere is an inmate on California's death row.  He was

19   convicted of one count of first-degree murder for the killing of Don Davis and two

20   counts of second-degree murder for the killings of Michelle and Melissa Davis,

21   accompanied by a finding of multiple-murder special circumstance, and was

22   sentenced to death.  Upon the direct appeal of that sentence, the California

23   Supreme Court found that defense counsel's failure to present any mitigating

24   evidence in the penalty phase deprived Deere of effective assistance of counsel,

25   notwithstanding Deere's own decision to invite a death sentence.  The sentence

26   was reversed as to penalty and affirmed in all other respects.  People v. Deere, 41

27   ————————————————————

28   [*] Vince Cullen is substituted for his predecessor, Robert L. Ayers, Jr., as Warden of California
     State Prison at San Quentin, pursuant to Federal Rule of Civil Procedure 25(d)(1).

1  Cal. 3d 353, 710 P.2d 925, 222 Cal. Rptr. 13 (1985).

2         After the retrial of the penalty phase, Deere was again given a sentence of

3  death.  The California Supreme Court affirmed the death sentence upon automatic

4  appeal.  People v. Deere, 53 Cal. 3d 705, 808 P.2d 1181, 280 Cal. Rptr. 424

5  (1991).

6         Deere filed his initial Petition for Writ of Habeas Corpus on May 18, 1993,

7  and filed his First Amended Petition for Writ of Habeas Corpus on July 11, 1994

8  ("First Amended Petition").  Petitioner filed a Motion for Evidentiary Hearing on

9  October 24, 1995, which was denied in part on May 9, 2000, and denied as to the

10  remainder on June 19, 2000 (Taylor, J.).[1]  On appeal, the Ninth Circuit held that

11  Deere had presented evidence that "create[d] a real and substantial doubt" as to his

12  competency to plead guilty if "taken at face value and assumed to be true," and

13  that an evidentiary hearing was required.  Deere v. Woodford, 339 F.3d 1084,

14  1087 (2003) (internal quotation omitted).  The Ninth Circuit remanded the case "to

15  the district court with directions to hold a hearing on Deere's claim that he was

16  incompetent to plead guilty, and to reconsider the petition for writ of habeas

17  corpus as to the claims premised on that contention."  Id. at 1087.  This Court held

18  an evidentiary hearing on September 25, 26, and 27 and October 9, 2007 (Snyder,

19  J.).

20         On August 21, 2009, the Court took "the unusual step of giving Petitioner

21  another chance to present additional evidence to support his federal habeas claim

22  for relief.  The Court order[ed] Petitioner to submit to four psychological or

23  psychiatric examinations.  The Court [took] this unusual step to ensure that the

24  record will include all evidence that would best answer the question remanded

25  back to this Court by the Ninth Circuit for its resolution."  (Order re Court

26  Mandated Mental Examinations, August 21, 2009, at 3.)  The parties agreed that

27  _____

28  [1] The instant case was randomly reassigned to the calendar of Judge Christina A. Snyder on July 5, 2005, following the retirement of Judge Gary L. Taylor.

1   on December 15, 2009, Dr. Park Dietz, for Respondent, and Dr. Pablo Stewart, for

2   Petitioner, would jointly examine Petitioner.  (Joint Status Report, filed September

3   28, 2009, at 2; see also Order re Schedule for Court Mandated Mental

4   Examination and Reports, October 5, 2009.)  The parties agreed that the

5   evaluations and supporting materials would not be used against Petitioner in the

6   event of retrial, except for the purpose of impeaching Petitioner's testimony

7   should he testify, and would not be used in any competency evaluations or

8   determinations beyond the instant proceedings.  (Protective Order re Psychiatric

9   Reports, December 3, 2009.)

10        On December 29, 2009, the parties informed the Court that Petitioner

11  refused to submit to the scheduled psychiatric evaluations.  (See Joint Status

12  Report re Compliance with Court Order Dated October 5, 2009, filed December

13  29, 2009, at 2.)  Petitioner's counsel informed the Court that Petitioner initially

14  agreed to the evaluation "after considerable efforts by counsel."  (Id.)  Petitioner's

15  counsel explained:

16          As the scheduled date approached, however, Petitioner
            began to back off from that agreement to the point that
17          less than one week before the scheduled evaluation,
            Petitioner advised counsel that he would not participate
18          in the evaluation.  Due to the limited time available, . . .
            counsel were unable to engage Petitioner in further
19          discussions. . . .  Although subsequent communication
            with Petitioner gave counsel some hope that he would
20          cooperate and that another date could be scheduled,
            counsel is presently convinced that no amount of further
21          communication with Petitioner on this issue will result in
            his cooperation.  After conferring with psychiatrist Pablo
22          Stewart, who was designated as Petitioner's expert for
            this evaluation [and who testified at Petitioner's
23          evidentiary hearing], counsel is of the opinion that
            Petitioner's refusal is the product of his mental
24          disabilities and disorders.

25  (Id.)  The parties requested that the Court rule on Petitioner's First Amended

26  Petition based upon the evidence and briefing previously submitted.  (Id. at 2-3.)

27  In consideration of the information provided in the parties' Joint Status Report, the

28  Court indicated that it would so rule.  (Order re Ruling to Be Issued Based on

1   Record Before the Court, January 12, 2010.)

2   In light of the evidence adduced at the evidentiary hearing and presented in

3   the parties' briefing, the Court has reviewed Petitioner's claims of ineffective

4   assistance of counsel, in failing to protect Deere from standing trial while

5   incompetent and failing to represent Deere properly with respect to his

6   competency to plead guilty (Claim 6(b), (c)); of actual incompetence at the time of

7   Deere's guilty plea, to assist counsel and defend against capital charges (Claim 1),

8   and to enter a knowing, intelligent, and voluntary plea (Claim 4); and of

9   constitutional inadequacy in the competency evaluation he received from Dr.

10  Tommy Bolger (Claim 3).  (See Order re Respondent's In Limine Motion, May

11  14, 2007 (defining claims for reconsideration and limiting reconsideration of

12  Claim 3 as such).)

13  As set forth below, the Court finds that Petitioner is entitled to relief based

14  upon the ineffective assistance of trial counsel, and grants in part Petitioner's First

15  Amended Petition on that basis.  Accordingly, the Court does not reach the issue

16  of Deere's actual competence or incompetence at the time of his guilty plea.

17  Petitioner's claim of constitutional inadequacy in the competency evaluation he

18  received is denied.

19  **I.      Factual Background and Trial Court Proceedings**

20  **A.      Background**

21  Deere's father was a Native American of Creek and Seminole heritage.  (J.

22  Br. at 10 ¶ 19.)[2]  His mother was Caucasian.  (Id.)  Deere was born in 1954.  (Id.)

23  At the time, his family lived with his father's mother in Oklahoma near a polluted

24  stream.  (Id. at 10 ¶¶ 19-20.)  As a child, Deere played in a nearby pond that was

25  fed by the polluted stream.  (Id. at 10 ¶ 20.)

26  Deere had convulsions about three or four times before the age of one year.

27  _____

28  [2]  The Court accepts and adopts the stipulated facts in the parties' Joint Pre-Evidentiary Hearing
Brief and Order, filed March 5, 2007 ("J. Br."), and entered in a concurrent Order.  All references
to the parties' Joint Brief are to the indicated subparagraphs of paragraph 5.

4

(Id. at 10-11 ¶ 21.)  He had seven siblings, and the family lived in chronic poverty. (Id. at 11 ¶ 22.)  His father and mother came to work as farm laborers in Blythe, California.  (Id.)  His father worked with pesticides and fertilizers.  (Id.)

The Deere children played in a ditch apparently carrying polluted water, ate fish from the canals, and used the water to irrigate the family's vegetable garden. (Id. at 11 ¶ 23.)  Chemicals were stored near the area that the children played and the fields were often sprayed with pesticides.  (Id. at 12 ¶ 23.)  The water the family drank came from a well on the property and sometimes had an odd taste. (Id. at 11 ¶ 23.)

Deere's father was a violent alcoholic, who beat his children and his wife. (Id. at 13 ¶ 26.)  Deere was also beaten by his mother.  (Id.)

Beginning in the third grade, Deere was placed in special education classes. (Id. at 12 ¶ 25.)  He was described as hyperactive with a very short attention span, and his teacher thought he had emotional problems that caused his learning difficulties.  (Id.)  Testing administered to Deere when he was ten years old showed a verbal I.Q. of 76, a performance I.Q. of 80, and a full scale I.Q. of 76. (Id. at 13 ¶ 25.)  Deere was electrocuted when he was ten or eleven years old, and after the electrocution he was not as coordinated.  (Id. at 12 ¶ 24.)

By age eleven Deere was cutting himself, and by age twelve he was running away from home.  (Id. at 14 ¶ 28.)  Deere quit school in the eighth grade and worked in the fields full time.  (Id. at 12 ¶ 23.)  When he was fourteen years old, Deere was committed to the California Youth Authority and spent the next several years in and out of various institutions.  (Id. at 14 ¶ 28.)

When Deere was seventeen years old, he was discharged from the California Youth Authority and began living with his then-girlfriend, Alice Lyon.  (Id. at 14 ¶ 29.)  Lyon believed Deere was "two different people," a good guy called Ronnie, and a scary, violent individual called "Running Deer," who appeared when Deere was intoxicated on drugs or alcohol.  (Id.)  Deere's girlfriend at the time of the

murders, Cindy Gleason, also characterized Deere in this way.  (<u>Id.</u>)

Deere repeatedly asked Alice Lyon and others to kill him.  (<u>Id.</u>)  Lyon left Deere shortly after their daughter, April, was born, because she feared for her own safety.  (<u>Id.</u>)

Deere was known by local law enforcement for his alcohol related offenses, and once told the officers to let him die when he was bleeding profusely from his hand.  (<u>Id.</u> at 14-15 ¶ 30.)  He refused medical attention on another occasion when police found him with blood on his sleeves, six-inch cuts on both arms, and a shorter cut on his chest.  (<u>Id.</u> at 15 ¶ 30.)  He was arrested several times for being drunk in public, once for grand theft for poaching a cow, and once for being in possession of a concealed weapon.  (<u>Id.</u> at 14-15 ¶¶ 30-31.)

During the six months before the murders, Deere was arrested numerous times for being drunk in public, for disturbing the peace, and for other misdemeanors.  (<u>Id.</u> at 15-16 ¶ 32.)  The incidents of Deere's self-mutilation increased.  (<u>Id.</u>)  Deere complained of constant headaches and drank a fifth of vodka daily.  (<u>See</u> <u>id.</u> at 16 ¶ 32.)

Meanwhile, Cindy's sister, Kathy, was also experiencing domestic problems.  (<u>Id.</u> at 16 ¶ 33; Evid. Hr'g Ex. P15-B).  She sought a divorce from her husband, Don Davis, and went to social worker Virginia Erickson Tiernan (formerly Ginny Erickson Wyatt) of Children's Services for help for mistreating her two daughters when disciplining them.  (J. Br. at 16 ¶ 33; Evid. Hr'g Ex. P15-B.)

In early January, 1982, Deere's relationship with Cindy was failing, and Cindy took their baby and moved to her mother's house.  (J. Br. at 16 ¶ 33.)  Deere said that he would rather die than let Cindy have the baby, and he repeatedly threatened Cindy's family.  (<u>Id.</u>)  Deere threatened to kill everyone in the Gleason family if he was not given his baby, and threatened to kill members of the family if

1   she left him.  (Evid. Hr'g Exs. P20-Q, P20-R; 9/25/07 E.H.T. 168-69, 171.)[3]  He

2   was arrested for trespassing on the property of Cindy's mother's house on January

3   9, 1982.  (J. Br. at 16 ¶ 32; Evid. Hr'g Ex. P20-R.)

4          On January 12, 1982, Deere and Cindy met with Ms. Erickson Tiernan in an

5   effort to prevent losing custody of their child through Social Services.  (J. Br. at 16

6   ¶ 32; Evid. Hr'g Ex. P15-A ¶ 2.)  Ms. Erickson Tiernan was the sole social worker

7   in Blythe for Children's Services, and she was responsible for investigating child

8   abuse circumstances and providing families with support in raising their children.

9   (Evid. Hr'g Ex. P15-A ¶ 2; 9/25/07 E.H.T. 155.)  Ms. Erickson Tiernan's work

10  involved interviewing and documenting the statements of parents, children, and

11  witnesses; drawing conclusions and taking action based upon them; keeping case

12  records for all her activities; and writing reports to courts.  (9/25/07 E.H.T. 156.)

13         When she met with Deere and Cindy on January 12, 1982, Ms. Erickson

14  Tiernan saw a 7 or 8 inch cut on Deere's arm.  (Id. at 158-59, 161.)  Cindy

15  reported to Ms. Erickson Tiernan that Deere "had cut a deep gouge mark in his

16  chest area including puncturing a lung . . . ."  (Id. at 161.)  Deere explained that if

17  he did not cut himself, he would hurt someone else.  (Id. at 162-63.)  Ms. Erickson

18  Tiernan testified that she "saw that [Deere] had psychiatric problems from the first

19  moment [she] looked at him."  (Id. at 170.)  She observed what she described as a

20  "dark emptiness" in Deere and identified him as deeply disturbed.  (Id. at 163-64.)

21  She asked Deere if he would be willing to go to the Desert Community Mental

22  Health Center, and Deere agreed.  (Id. at 163.)  Deere was seen by an intake

23  worker there on January 15, 1982.  (Evid. Hr'g Ex. P16.)  The intake worker

24  reported, inter alia, that Deere "say[s] that when things go wrong, he gets

25  depressed, and then he takes some drink. . . .  Clients [sic] mood is depressive,

26  mild to moderate. . . .  Client denies any suicidal ideation, [or] homocidal ideations

27  [sic]."  (Id.)  The intake worker diagnosed a marital problem, alcohol abuse, and

28

---

[3]  "E.H.T." refers to the transcript of this Court's evidentiary hearing.

1   antisocial personality disorder, but set a goal in Deere's Individualized Treatment
2   Plan for individual therapy to "[e]xplore with client effective ways of coping with
3   his periods of depression." (Id.)

4        In February 1982, Deere and Cindy temporarily reconciled and moved into
5   Don Davis' trailer. (J. Br. at 16 ¶ 34.) That same month, Cindy left Deere again,
6   however, and again took their baby. (Id. at 16-17 ¶ 34.) Deere entered an
7   aggravated cycle of self mutilation, substance abuse and threats. (Id. at 17 ¶ 34.)
8   Cindy sought assistance from law enforcement, social services and probation.
9   (Id.) She called Ms. Erickson Tiernan twice on February 22, 1982, once through
10  the sheriff's department and once at night with her mother, June Gleeson.
11  (9/25/07 E.H.T. 166-68.) Ms. Erickson Tiernan advised Cindy to "get [Deere] into
12  mental health" and to continue to call the sheriff if Deere came to her home
13  intoxicated and aggressive. (Id.) The sheriff's department held Deere for four
14  hours that night and released him. (Id.) Ms. Erickson Tiernan believed the
15  situation had become an emergency. (Id. at 168-69.) The next morning, she called
16  the Mental Health Department and the probation department and unsuccessfully
17  requested that Deere be placed under a 72-hour psychiatric hold, pursuant to
18  California Welfare and Institutions Code Section 5150. (Id. at 166-69; J. Br. at 17
19  ¶ 34.)

20       Fearing that Deere's depression would lead to violence, the probation
21  department did advise Deere to seek assistance from the mental health clinic. (J.
22  Br. at 17 ¶ 34.) Deere returned to the mental health clinic on February 25, 1982.
23  (Id.) The intake worker at the mental health clinic considered the slash on Deere's
24  right forearm to be a "manipulative/hostile gesture to get attention," and concluded
25  that there was "no indication" that Deere presented a "danger to self." (Id.) The
26  intake worker advised Deere to keep his regularly scheduled appointment for the
27  following week. (Id.)

28       Ms. Erickson Tiernan continued to receive calls from Cindy and June, and

8

in the two weeks before the murders Cindy and June called her two or three times each night.  (9/25/07 E.H.T. 170-71.)  During those two weeks, Ms. Erickson Tiernan went to the sheriff's department, the police department, and the probation department in person every day, in her official capacity, regarding Deere.  (Id. at 171-72.)  She repeatedly informed the sheriff's department of Deere's threats to kill Cindy or her family members.  (Id. at 171.)

The day before the murders, on March 3, 1982, Cindy called the police to complain about Deere's threatening and drunken behavior.  (J. Br. at 17 ¶ 35.)  June called Ms. Erickson Tiernan and reported that she had gone to Dr. Freddie Easton, Supervising Clinical Psychologist at the Desert Community Mental Health Center, about Deere.  (9/25/07 E.H.T. 173-74.)  Dr. Easton had previously approved the Intake Summary prepared from Deere's January 15 visit to the Desert Community Mental Health Center.  (See Evid. Hr'g Ex. P16.).  Dr. Easton told June that he was unable to talk with Deere unless June and Cindy went through "the proper channels."  (9/25/07 E.H.T. 173-74.)  The next day, Cindy also called the probation officer for assistance, and the probation officer suggested that Cindy call Dr. Easton.  (J. Br. at 18 ¶ 36.)  When Cindy did so, Dr. Easton advised her to set up an appointment.  (Id.)

That same day, on March 4, 1982, at approximately 3:00 p.m., Don Davis picked up his two daughters from Kathy for visitation and went to his trailer.  (Id. at 18 ¶ 37; Evid. Hr'g Ex. P21.)  A short time after 3:00 p.m., Deere called Cindy and told her, "I'm going to hurt you like you're hurting me.  Now you'll know how much you're hurting me.  It'll be on your conscience[;] I'm not responsible for what I'm going to do."  (Evid. Hr'g Ex. P21.)  At approximately 4:30 p.m., Don called Cindy because he suspected that someone had been in his trailer.  (J. Br. at 18 ¶ 37.)  Don told Cindy that there was a different tape in the tape player and that he would look around and call her back.  (Id.)  Don did not call back.  (Id.)  Several hours later, Cindy and Kathy drove out to the trailer and discovered

1    that Don and both girls had been shot and killed.  (Id.)

2         Between the hours of 6:00 p.m. and 8:30 p.m. that evening, witnesses

3    reported seeing Deere at a market, apparently drunk or in a daze.  (Id.)

4         Deere was immediately the focus of the criminal investigation.  (Id. at 19 ¶

5    38.)  Deere was found five days later, on March 9, 1982, and arrested in the

6    outskirts of Blythe.  (Id. at 19 ¶ 39.)  At the time of his arrest, Deere was sitting

7    under a bush, missing his right shoe and his shirt.  (Id.)  He had with him three

8    photographs of Cindy, two handwritten notes to "Shorty" (Cindy's nickname), and

9    one note to "mom and dad."  (Id.)  Deere was arrested without incident, and he did

10   not possess any weapons.  (Id.)  A .22 rifle was found later in a nearby campsite

11   with the following words scratched into the wooden stock:  "if you have gone to

12   doctor I got end the mean Ronnie I wish I understood – Kathy she help kill them

13   now love her – Now live with it for life – you killed them to – Shorty you hurt like

14   me how dose [sic] feel."  (Id.)  Deere told the arresting officers that he had been

15   living on ditch water and raw birds.  (Id.)

16        When he was interviewed at the police station, Deere told the interrogator

17   that he did not remember anything about being at the trailer, and the first time he

18   heard that the children were dead was when he was arrested.  (Id. at 19 ¶ 40.)

19   Later that afternoon, Deere was interviewed by Dr. Tommy Bolger, at the request

20   of the police.  (Id. at 20 ¶ 41.)

21        Deere told Dr. Bolger that he loved the two children, that he cut himself to

22   let his anger escape, that he used to drink excessively because of his headaches,

23   that he was two people (a good Ronnie and a bad Ronnie), and that he wished

24   someone would kill him.  (Id.)

25        After the one-hour conversation, Dr. Bolger concluded in a report (the

26   "March report") that Deere was not mentally ill, was of dull/normal intelligence,

27   showed no signs of organicity, understood the nature of the charges against him,

28   was capable of forming intent and of carrying out an action, and was capable of

1  cooperating with counsel if he felt it to his advantage.  (Id.; Evid. Hr'g Ex. P34-
2  A.)

3  　　　In a later interview with police, Deere talked about having blackouts since
4  the age of 13 and about his headaches.  (J. Br. at 20 ¶ 42.)  He gave the police
5  permission to talk with the Mental Health Clinic and with Dr. Bolger.  (Id.)  The
6  police observed that Deere had trouble spelling words such as the days of the
7  week, months, and numbers.  (Id.)

8  　　　While in jail, Deere wrote numerous lengthy letters to Cindy and others.
9  (Id. at 21 ¶ 45.)  Most of the letters had a religious theme, reflecting Deere's
10  religious conversion.  (Id. at 21-22 ¶ 45.)  In his letters to Cindy, Deere said that he
11  was exhausted, that the pressure was unbearable, and that he wanted to get things
12  over with.  (Id. at 21 ¶ 43.)

13  　　　Deere later admitted in letters to Cindy and to his sister that he was high at
14  his preliminary hearing (which was delayed for that reason), and told his sister he
15  was going to try to be in his "right mind" at the rescheduled hearing.  (Id. at 21 ¶
16  44.)

17  　　　**B.　　Trial Court Proceedings**

18  　　　Riverside County Deputy Public Defender Glenn S. Jones ("Attorney
19  Jones") was appointed to represent Deere.  (Id. at 22 ¶ 46.)  At his first meeting
20  with Attorney Jones, Deere told him that he absolutely did not want a trial, did not
21  want any defense presented on his behalf, and demanded to be executed.  (Id.)
22  Jones noticed that Deere had a significant gash on his arm and numerous scars on
23  his abdomen and chest from what appeared to be self-inflicted wounds.  (Id.)
24  From their first meeting, Deere viewed his attorney as "the enemy," as someone
25  who would stand in the way of his wishes.  (Id.)  He never discussed the facts of
26  the case with Attorney Jones, and he never changed his position that he wanted no
27  defense presented on his behalf and demanded to be executed.  (Id. at 22-23 ¶ 46;
28  see also Evid. Hr'g Ex. R2-B at 11 (testimony of Attorney Jones that "[Deere]

11

1   never would discuss the facts of the case, never ever").)

2        Attorney Jones found there were obvious mental health aspects to the case.

3   (J. Br. at 23 ¶ 47.)  Attorney Jones was aware of Deere's self-inflicted mutilation,

4   alcoholism, and drug abuse, and acknowledged that these were "red lights" or

5   indicators that his client may have had some mental issues.  (9/27/07 E.H.T. 31,

6   35-36, 39.)  Mr. Jones testified that he was aware that Deere had been self-

7   mutilating "for quite some time," that "right from the beginning from the first

8   interview, [he] knew that [he was] dealing with an abnormal person," and that that

9   abnormality "very well could be" stemming from a mental issue.  (Id. at 33-35.)

10  Mr. Jones was aware of Deere's alcoholism "early on," and knew that alcoholism

11  "can be either an indicator of a mental problem or a mask of a mental problem."

12  (Id. at 35, 36.)

13       Attorney Jones submitted an application for funding indicating that "the

14  proper defense of this case will require extensive psychological psychiatric [sic]

15  examination of Deere," and that he intended to retain at least one psychologist and

16  one psychiatrist.  (J. Br. at 24 ¶ 48.)  Although the Court authorized $5,000.00,

17  only $1,696.86 was spent.  (Id.)

18       Attorney Jones knew psychologist William Jones, Ph.D., because he had

19  worked with him on several cases.  (Id. at 23 ¶ 47.)  Attorney Jones spoke with Dr.

20  Jones for about 45 minutes on March 17, 1982.  (Id.)  He provided Dr. Jones with

21  the police reports of the homicides and with Dr. Bolger's March report.  (Id.)

22  Attorney Jones asked Dr. Jones to conduct testing and provide him with a general

23  psychological evaluation, because he wanted background information before

24  focusing upon any particular mental defense.  (Id.)  Attorney Jones had absolutely

25  no doubt that Deere was competent and saw no hallmarks at all of incompetency.

26  (Id. at 23-24 ¶ 47.)  Although Attorney Jones then issued subpoenas to obtain

27  Deere's medical, school, juvenile court, and sheriff's department records and

28  received records from two physicians and the sheriff's department, he did not give

1    any of these records to Dr. Jones or to Dr. Bolger.  (Id. at 24 ¶ 47.)

2    　　Attorney Jones's request to Dr. Jones to perform a "general evaluation" of

3    Deere did not include the issue of Deere's competency.  (Evid. Hr'g Ex. R2-B at

4    64-65 (Attorney Jones Dep., June 17, 1998).)  Attorney Jones testified that he

5    "didn't retain him [Dr. Jones] to do anything in the area of incompetency."  (Id. at

6    99.)  Attorney Jones stated that he "would have made specific reference to

7    competency" had he intended Dr. Jones to evaluate it.  (Id. at 64-65.)  Attorney

8    Jones indicated that it was "his general practice" to request such a general

9    evaluation without focusing on any particular issue, like competency (id.), and that

10   he "really doubt[ed]" that he would have requested Dr. Jones to perform a

11   competency evaluation early on in the case.  (9/27/07 E.H.T. 16.)  Mr. Jones

12   explained that he "wouldn't want to get into issues that may come back to haunt

13   [him] at a later point.  Competency is a very tricky ground in serious criminal

14   cases because when defendants make statements that can get into the record and

15   get into the prosecution, then you lose control of the case."  (Id.)  He explained

16   that his general practice, as "a matter of strategy," was to "sever out my defense

17   expert, and if I'm going to move into competency areas, [retain] a separate expert

18   so I don't taint either side with what may come out," and so that he could avoid

19   "things coming out that you don't want in the record. . . .  [A]s a matter of general

20   practice, I just wouldn't want my Ph.D., who is doing my workup, to get involved

21   with the competency issue."  (Evid. Hr'g Ex. R2-C at 133-34.)  While Attorney

22   Jones indicated that he would have expected Dr. Jones to relay to him any

23   competency concerns that may arise, he specified that he would only have that

24   expectation "unless I specifically told [Dr. Jones] just to stay away from

25   competency.  I may have.  I think I have told that to doctors sometimes when I'm

26   really concerned that something may get into the record I don't want in the

27   record."  (Id.)

28   　　Dr. Jones also testified that Attorney Jones did not ask him to address

13

1    Deere's competence and that he did not consider it an objective of his evaluation.

2    (9/25/07 E.H.T. 13, 32, 35.)  Dr. Jones explained that the ethical principals

3    generally accepted in the field in 1982 (later published in a formal code of ethics)

4    and the established procedure at that time dictated that forensic psychologists

5    "avoid offering information from their investigation or evaluations that does not

6    bear directly upon the legal purpose of their professional services and that is not

7    critical as support for their product . . . except where such disclosure is required by

8    law." (Id. at 35-36.)  Dr. Jones testified that he did not include an explicit opinion

9    about Deere's competence in his written report based upon that established

10   principal and practice.  (Id.)

### 1.    Court Appointment of Dr. Bolger for Competency Assessment

13         On June 18, 1982, Attorney Jones moved to withdraw Deere's plea of not

14   guilty.  The prosecutor suggested that Dr. Bolger be appointed to conduct a

15   competency assessment "as a precaution," and represented that Dr. Bolger was a

16   "board certified" psychiatrist. (J. Br. at 24-25 ¶ 49; Deere, 339 F.3d at 1085.)

17   Attorney Jones concurred, despite knowing that Dr. Bolger had no formal

18   psychiatric training whatsoever, and knowing that Dr. Bolger had interviewed

19   Deere in March and opined that Deere was not mentally ill, understood the charges

20   against him, and was capable of cooperating with counsel in his defense.  (J. Br. at

21   25 ¶ 49; see also Evid. Hr'g Ex. R3 at 57-58.)  Attorney Jones told Dr. Jones that

22   Dr. Bolger's report was more or less "a joke," and Dr. and Attorney Jones

23   discussed the inadequacy of Dr. Bolger's report.  (Evid. Hr'g Ex. R3 at 55-58.)

24   Dr. Jones testified that Mr. Jones:

25                  characterized Dr. Bolger as sort of a hack.  No one else
                    would go to Blythe, so they used him in that area.  It was
26                  someone who had no formal psychiatric training
                    whatsoever, but he worked as a prison physician and
27                  may have done psychiatric-type things there.  It was my
                    recollection that somewhere along the line that Dr.
28                  Bolger was saying that he was competent, and that his
                    conclusion may not have been based on an adequate

1
2
3

> evaluation, but they [Mr. Jones and Deere] weren't
> contesting that because Mr. Deere didn't want to contest
> it, I guess, and Mr. Jones believed that he had a logical,
> some kind of philosophical right to plead guilty as some
> sort of – in some sort of rational way.

4   (Id.)  Attorney Jones knew that he "definitely could have asked for an independent

5   examiner and one would have been appointed."  (Evid. Hr'g Ex. R2-C at 158.)

6   Attorney Jones declared that he did not object to Dr. Bolger's appointment,

7   however, because he believed that the determination of Deere's competency was a

8   pro forma matter about which there was no question.  (Evid. Hr'g Ex. R2-A ¶ 14.)

9        Dr. Bolger, in fact, had never been board certified, despite his testimony to

10   the contrary at Deere's penalty retrial in 1986.  (J. Br. at 31 ¶¶ 58-59; see also

11   Evid. Hr'g Ex. P38-B.)  Dr. Bolger's educational credentials did not qualify him

12   for board certification.  (J. Br. at 31 ¶ 59.)  Dr. Bolger entered the College of

13   Osteopathic Physicians and Surgeons in 1952 and received the degree of Doctor of

14   Osteopathic Medicine in 1957.  (Id. at 31-32 ¶ 59.)  He was granted the degree of

15   Medical Doctor from the California College of Medicine in 1962 through the

16   California Reunification Act.  (Id. at 32 ¶ 59.)  From 1965 to 1970, Dr. Bolger was

17   employed at Patton State Hospital as a Physician and Surgeon II.  (Id.)  In January

18   1975, Dr. Bolger was hired at San Quentin State Prison as a Chief Medical

19   Officer.  (Id.)  He transferred to the Correctional Training Facility at Soledad in

20   September 1975 as a Physician and Surgeon, and in February 1977 transferred to

21   the class of Staff Psychiatrist.  (Id.)  In May 1979, he voluntarily resigned from

22   state service.  (Id.)  He moved to Blythe and was hired by the County of Riverside

23   as a medical and psychiatric consultant.  (Id.)

24        Dr. Bolger had a prior relationship with Deere's father as his treating

25   physician and had previously interviewed Deere in that capacity.  (Id. at 32 ¶ 60.)

26   Not only did Dr. Bolger fail to disclose the prior interview in his reports on

27   Deere's competency in March and June of 1982 and in his testimony in 1986, he

28   also affirmatively testified in 1986 that he had no knowledge of Deere until

1  interviewing him in March 1982.  (<u>Id.</u> at 32-33 ¶ 60; <u>see also</u> Evid. Hr'g Exs. P34-

2  A, P34-B.)  Beginning in 1981, Dr. Bolger had seen Deere's father, EJ Deere, at

3  the Blythe Hospital for seizures, and also at the mental health clinic.  (J. Br. at 32 ¶

4  60.)  Dr. Bolger opined that EJ's seizures were related to his alcoholism.  (<u>Id.</u>)  Dr.

5  Bolger took a family history from EJ's wife and children, including Deere, about

6  EJ's alcoholism.  (<u>Id.</u>)  At that time, Dr. Bolger formed the opinion about Deere

7  that the information Deere provided was "merely [Deere's] attempt to blame his

8  problems on someone else."  (<u>Id.</u> at 33 ¶ 60.)  Dr. Bolger did not disclose his prior

9  interview of and opinion about Deere during the 1982 proceedings, in his March

10 and June competency reports or otherwise.[4]  (<u>Id.</u> at 32-33 ¶ 60.)

11       In his June report, Dr. Bolger reported that Deere was competent to plead

12 guilty.  (Evid. Hr'g Ex. P34-B.)  Dr. Bolger saw no evidence of psychosis or

13 abnormal thinking.  (<u>Id.</u>)  He found that Deere was well aware of the charges

14 against him, understood the waiver of the right to a jury trial, and could adequately

15 assist counsel.  (<u>Id.</u>)

16            **2.      Evaluation by Dr. Jones**

17       Meanwhile, Attorney Jones went forward with Dr. Jones's evaluation of

18 Deere, though he did not change his instructions to Dr. Jones to perform a "general

19 evaluation" that did not include competency.  (J. Br. at 25 ¶ 50; Evid. Hr'g Ex. R2-

20 B at 64-65, 99; 9/25/07 E.H.T. 13, 32, 35.)  Deere had previously refused to

21 cooperate with counsel's request that he be evaluated by Dr. Jones.  (J. Br. at 25 ¶

22 50.)  Deere agreed to cooperate with counsel's request only after Attorney Jones

23 agreed to allow Deere to plead guilty.  (<u>Id.</u>)

24       On June 23, 1982, two days before Deere changed his plea to guilty, Dr.

25 Jones examined Deere.  (<u>Id.</u> at 26 ¶ 51.)  Dr. Jones interviewed Deere for one and

26 a half hours, but then switched to psychological tests for two and a half hours

27 because Deere was "tense and very guarded," and Dr. Jones felt he "was not

28 ─────────────────
   [4]   Dr. Bolger also engaged in ex parte communications with the trial court, recommending that EJ not be called as a witness in Deere's trial.  (J. Br. at 32-33 ¶ 60.)

getting optimal information." (Id.; 9/25/07 E.H.T. 18-21.)  Dr. Jones's

psychological analysis included a psychological interview, Wechsler Adult

Intelligence Scale Revised Test, Wide Range Achievement Test, the Rorschach

Test, and tests regarding memory for designs, human figure drawings, and

schematic apperception.  (9/25/07 E.H.T. 14-15.)  There were "elements" of Dr.

Jones's evaluation "that would overlap with the competency evaluation" (id. at

126), though Dr. Jones did not complete the additional procedure followed to

evaluate competency.  (Id. at 37.)  Nevertheless, Dr. Jones stated that a general

psychological evaluation that is focused upon mental abilities, thinking styles, and

emotional attributes could detect the "red flags" that would indicate a problem

with mental competency.  (Id. at 126.)

One week later, after Deere pled guilty, Dr. Jones continued his interview of

Deere, but Deere cut off the interview after thirty minutes.  (J. Br. at 26 ¶ 51.)  Dr.

Jones reported that Deere "broke off the interview, not just the interview, but

stated emphatically that he would not cooperate with any further part of the

evaluation.  And he stopped talking and did not answer my questions as to why he

was doing this, what his reasons were."  (9/25/07 E.H.T. 18-20.)  Dr. Jones opined

that Deere did not cooperate with the evaluation and "didn't complete it because

he was not able to deal with the emotions about discussing the death penalty and

the issues pertaining to the crime itself."  (Evid. Hr'g Ex. R3 at 69; see also Evid.

Hr'g Ex. R2-B at 28 (testimony of Attorney Jones that Deere likely broke off the

evaluation because "the doctor started getting into areas that he didn't want to talk

about").)  Dr. Jones testified that "when [Deere] stopped cooperating, it was not a

choice."  (9/25/07 E.H.T. 138.)  Dr. Jones delivered his written report to Attorney

Jones only after the second interview session.  (J. Br. at 26 ¶ 52.)

As Attorney Jones had instructed, Dr. Jones's report focused upon Deere's

background, intellectual ability, and identification issues.  (Id.)  Dr. Jones reported

that Deere had adequate memory except for the homicides, strongly identified with

17

Native Americans, inflicted cuts on himself when drunk to keep from hurting others, drank a fifth of vodka a day by age 20 but did not believe he had a drinking problem, spent $450 a week on marijuana, used a wide variety of drugs, lost fifty pounds in the month before he was arrested, frequently asked others to kill him, and would prefer a sentence of death instead of life without the possibility of parole.  (Id.)  Dr. Jones assessed Deere's full scale IQ at 77, in the seventh percentile of full scale IQ, and in the "borderline" (implying borderline retarded) range, according to Dr. Jones.  (9/25/07 E.H.T. 15-16; Evid. Hr'g Ex. P1-A.)  Deere's verbal score was 76, in the sixth percentile and also in the borderline range, and his performance IQ was 85, in the low average range.  (9/25/07 E.H.T. 15-16; Evid. Hr'g Ex. P1-A.)  Dr. Jones scored Deere's reading level at a 5.7 grade level, his spelling at a 3.9 grade level, and his math at a 3.3 grade level.  (J. Br. at 26-27 ¶ 52.)

Dr. Jones found Deere to be resistant; guarded and emotionally over-controlled; depressed and lonely, with feelings of helplessness and abandonment; and fatalistic and passive in orientation to life.  (Id. at 27 ¶ 52.)  Dr. Jones opined that Deere lived in a fantasy world, idealized people, and became overwhelmed with discrepant reality, with a capacity for explosive discharge of feeling.  (Id.)  Dr. Jones observed that Deere had a negative self-concept and employed fantasy and macho images to compensate; had poor judgment; had little psychological stamina; had a tendency to avoid problems rather than dealing with them, and to take the path of least resistance; and had limited and superficial relationships with others.  (Id.)  Dr. Jones identified Deere as exhibiting some suicidal "acting out."  (Id.)  Dr. Jones noted that Deere was very dependent and experienced great stress due to his breakup with Cindy.  (Id.)  Dr. Jones diagnosed Deere with an adjustment disorder with depressed mood, mixed substance abuse disorder, and borderline personality disorder with anti-social aspects.  (Evid. Hr'g Ex. P1-A at 7.)

Had Attorney Jones asked Dr. Jones for his opinion regarding Deere's competency, Dr. Jones later attested in both 1993 and 2007, Dr. Jones would have informed Attorney Jones that Deere's competency "was very questionable. Mr. Deere was competent in the limited sense of knowing what was going on around him, so that he understood the nature of the criminal proceedings; however, Mr. Deere's mental disorders rendered him unable to assist counsel in the conduct of a defense in a rational manner." (Evid. Hr'g Ex. P1-B at 2-3; 9/25/07 E.H.T. 37, 144; <u>see also</u> J. Br. at 27 ¶ 53.) Dr. Jones would have advised that Deere was not able to make logical judgments about his defense and insisted on pleading guilty because he "had a compulsion to be punished with the death penalty and did not want anyone to interfere with that. Mr. Deere's insistence on pleading guilty was part of that compulsion and an <u>outgrowth of his mental disturbances</u>; it was irrational." (Evid. Hr'g Ex. P1-B at 3 (emphasis added); <u>see also</u> J. Br. at 27-28 ¶ 53; 9/25/07 E.H.T. 37, 144.) Dr. Jones concluded that Deere was "so bent on self-destruction that it <u>disabled</u> him from cooperating in a meaningful way with the presentation of a defense . . . ." (Evid. Hr'g Ex. P1-B at 3 (emphasis added); <u>see also</u> Evid. Hr'g Ex. R3 at 67; 9/25/07 E.H.T. 144; 9/25/07 E.H.T. 38-39.)

At the evidentiary hearing, Dr. Jones explained that Deere "was very self-destructive and consistent with the Borderline Personality in many ways including physically harming himself. Some of his self mutilations were on his forearms, were close to the veins, [indicating] that this was a suicidal course." (9/25/07 E.H.T. 37-38.)[5] Dr. Jones found that the Rorschach Test indicated that Deere "has capacity for explosive discharge of feeling. Aggressive feelings are likely to be directed toward the self." (<u>Id.</u> at 18.) Dr. Jones found that Deere had strong masochistic tendencies in his personality that led to self mutilation. (<u>Id.</u> at 25-26.) Dr. Jones opined that self mutilation is a characteristic of Borderline

---

[5] Dr. Jones also opined that Deere "may have" suffered from brain damage (Evid. Hr'g Ex. P1-B at 4), and that neuropsychological testing would be "appropriate and helpful to ensure a reliable assessment of Mr. Deere's myriad mental impairments." (<u>Id.</u> at 6.)

1    Personality Disorder, which he stated in Deere's case "was like a continuation of

2    his life pattern as being very self-destructive." (<u>Id.</u>) Dr. Jones testified that

3    typically people only inflict superficial cuts on themselves when they mutilate

4    themselves, but Deere's self-inflicted cuts were "extreme." (<u>Id.</u>) Dr. Jones

5    believed that Deere's preference for pleading guilty and his preferences for the

6    death penalty were a further extension of his very strong masochistic tendencies.

7    (<u>Id.</u> at 26-27.) Dr. Jones explained that at that time Deere was strongly motivated

8    to destroy himself. (<u>Id.</u>) In Dr. Jones's opinion, Deere "was so bent on self-

9    destruction that it disabled him from cooperating in a meaningful way with the

10   presentation of a defense and caused him to solicit the death penalty." (Evid.

11   Hr'g Ex. P1-B at 3.)

12          Dr. Jones observed that it was naïve to take Deere at face value because

13   he was not thinking logically. (<u>Id.</u>) Although Dr. Jones did not explicitly opine

14   about Deere's competency in his report, in keeping with the professional

15   standards at the time, he did state in his report that Deere's "preference for

16   pleading guilty and his preference for the death penalty are a further extension

17   of his very strong masochistic tendencies." (<u>See</u> <u>id.</u>; <u>see also</u> 9/25/07 E.H.T. 35-

18   36.)

19          Dr. Jones recalled conveying his concerns about Deere's competency to

20   Attorney Jones. (9/25/07 E.H.T. 32, 34-35, 128-129.) Dr. Jones testified:

21          I have a recollection that we talked either in person – I
             believe in person or on the telephone before I prepared
22          the report. I recall having a – this conversation sticks in
             my mind more vividly than anything else about this case.
23          The issue on one hand, my reservations that he was so
             self-destructive and on his hand [Attorney Jones's] the
24          idea . . . that opting for the death penalty was, in fact, a
             rational thing for Mr. Deere to do at the time and not, in
25          fact, a – something reflecting incompetence.

26   (<u>Id.</u> at 33-35.) Dr. Jones "felt Deere was incompetent," and "in essence [Dr.

27   Jones] told him that." (<u>Id.</u> at 34-35.) Dr. Jones recalls "debating this with him

28   [Attorney Jones] for some time." (<u>Id.</u>)

### 3. Acceptance of Guilty Plea and Waiver of Penalty Phase Jury Trial

On June 25, 1982, Deere pled guilty to three counts of murder. (J. Br. at 28 ¶ 54.) Deere also admitted the special circumstance allegation. <u>Deere</u>, 41 Cal. 3d at 357. Attorney Jones stipulated to Dr. Bolger's newly issued report, and permitted Deere to represent to the Court that he told Attorney Jones all the facts and circumstances Deere knew about the case, when Deere had in fact steadfastly refused to discuss the case with Attorney Jones. (J. Br. at 28-29 ¶ 54; <u>see also</u> Evid. Hr'g Ex. R2-B at 11-12.) Attorney Jones knew that he could have blocked Deere's guilty plea with an objection, but he joined in the plea because he was concerned about Deere's threats to disrupt the court proceedings if he was not permitted to plead guilty, and because he "found that petitioner's decision to plead guilty was a principled one [he] should respect." (J. Br. at 29 ¶ 54; Evid. Hr'g Ex. R2-A at ¶¶ 12, 18.) Attorney Jones told the Court that it was his "firm conclusion that there is no such defense [insanity/mental defense] after spending a great deal of effort and time investigating." (J. Br. at 29 ¶ 54.) Even after Attorney Jones reviewed Dr. Jones's written report, and that report "confirmed [Attorney Jones's] belief that there was a 'substantial mental defense,'" Attorney Jones did not feel prompted to reconsider his decision to allow Deere to plead guilty. (<u>Id.</u> at 27 ¶ 52, 29 ¶ 55.) Attorney Jones made no other use of Dr. Jones's report. (<u>Id.</u> at 29 ¶ 55.)

At the hearing to set the degree of the murders, Attorney Jones advised the Court that Deere had instructed him not to present any evidence in his defense. (<u>Id.</u> at 30 ¶ 56.) Attorney Jones informed the Court that the defense had one doctor, Dr. Bolger, and the Court continued the hearing so that it could "listen to what the doctors have to say." (<u>Id.</u>) At the rescheduled hearing, however, Attorney Jones advised the Court that Deere did not want his counsel to call Dr. Bolger "to avoid discussing Petitioner's family, childhood, and other 'private' matters." (<u>Id.</u>) The Court based its ruling on the degree of the murders upon the

1    preliminary hearing transcript and exhibits and a police report.  (<u>Id.</u> at 30.)

2          When the penalty phase jury selection was ready to commence, Deere told

3    the Court that he wished to waive his right to be present and threatened to "jump

4    on somebody else over there in the jail."  (<u>Id.</u> at 31 ¶ 57.)  The Court took a recess,

5    and out of Deere's presence, suggested that it could "get him examined again and

6    send him up to Patton [State Hospital] . . . .  He's not going to cooperate with you,

7    in any sense of the word, in his defense, he already has established that.  He may

8    not be competent."  (<u>Id.</u>)  Attorney Jones responded to the Court that he did not

9    see "any possible basis for concluding that [Deere is] not competent."  (<u>Id.</u>)  The

10   Court ultimately accepted Deere's waiver of a penalty phase jury trial and

11   sentenced him to death.  (<u>Id.</u>)

12   **II.    Analysis**

13         **A.    Ineffective Assistance of Counsel:  Claim 6(b) and (c)**

14         In Claim 6(b) and (c) of his First Amended Petition, Petitioner argues that

15   trial counsel performed inadequately in failing to protect Deere from standing trial

16   while incompetent and failing to represent Deere properly with respect to his

17   competency to plead guilty.

18                **1.    Legal Standard**

19         "The benchmark for judging any claim of ineffectiveness must be whether

20   counsel's conduct so undermined the proper functioning of the adversarial process

21   that the trial cannot be relied on as having produced a just result."  <u>Strickland v.</u>

22   <u>Washington</u>, 466 U.S. 668, 686 (1984).  Petitioner must demonstrate that (1)

23   counsel's performance was deficient and (2) the deficient performance prejudiced

24   the defense.  <u>Id.</u> at 687.

25         As to the deficiency of counsel's performance, Petitioner must show "that

26   counsel's representation fell below an objective standard of reasonableness,"

27   "considering all the circumstances," and was unreasonable "under prevailing

28   professional norms."  <u>Id.</u> at 688.  Ultimately, counsel has "a duty to bring to bear

22

such skill and knowledge as will render the trial a reliable adversarial testing process." Id. "Judicial scrutiny of counsel's performance must be highly deferential. . . .  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." Id. at 689.  The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (internal quotation omitted).

To establish that counsel's deficient performance prejudiced the defense, Petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

As it applies to competency to plead guilty, the "reasonable probability" threshold for establishing ineffective assistance of counsel is more easily reached than the "preponderance of the evidence" threshold for establishing actual incompetency under California law in 1982 (and today). See Cal. Penal Code § 1367; see also Medina v. California, 505 U.S. 437, 440 (1992) (upholding constitutionality of Cal. Penal Code § 1367 (1982), requiring proof of incompetency by a preponderance of the evidence).  "This [reasonable probability standard] is a lower burden of proof than the preponderance standard.  Thus, even if [petitioner] were to fail to prove his incompetency by a preponderance of the evidence, it is still possible that he raised sufficient doubt on that issue to satisfy the prejudice prong of his ineffective assistance of counsel claim." Bouchillon v. Collins, 907 F.2d 589, 595 (5th Cir. 1990).  While the Fifth Circuit noted in Bouchillon that "the evidence arguably support[ed] a different result under a preponderance standard," the court was nevertheless "confident" that the evidence met the reasonable probability standard and satisfied the prejudice prong of the

23

1   <u>Strickland</u> test.  <u>Id.</u> at 595 (internal quotation omitted).  Indeed, it may be precisely

2   a result of "counsel's failure to develop this issue [that] the record is necessarily

3   inadequate" to prove actual incompetence – even where the court is "satisfied" that

4   competency "should have been explored and counsel's failure to do so deprived

5   the petitioner of his right . . . to effective assistance of counsel."  <u>Wood v.</u>

6   <u>Zahradnick</u>, 430 F. Supp. 107, 110 n.1, 111 (E.D. Va. 1977) (granting relief based

7   on ineffective assistance of counsel and noting, "There are several facts . . . which

8   indicate that the petitioner was mentally competent at the time of trial. . . .  While

9   these factors are unquestionably relevant, no conclusion can be reached in the

10  absence of the adversarial development of the issue"), <u>aff'd</u>, 578 F.2d 980 (4th Cir.

11  1978) (affirming finding of ineffective assistance of counsel).

12       A defendant was incompetent in California in 1982 (as he or she would be

13  today) "if, as a result of mental disorder or developmental disability, the defendant

14  is unable to understand the nature of the criminal proceedings or to assist counsel

15  in the conduct of a defense in a rational manner."  Cal. Penal Code § 1367.  The

16  United States Supreme Court clarified in <u>Dusky v. United States</u> that "it is not

17  enough for the district judge to find that the defendant [is] oriented to time and

18  place and [has] some recollection of events, but that the test must be whether he

19  has sufficient present ability to consult with his lawyer with a reasonable degree of

20  rational understanding -- and whether he has a rational as well as factual

21  understanding of the proceedings against him."  362 U.S. 402, 402 (1960) (internal

22  quotation omitted).  This test applies equally to competence to plead guilty and

23  competence to stand trial.  <u>Godinez v. Moran</u>, 509 U.S. 389, 398-99 (1993);

24  <u>United States v. Mendez-Sanchez</u>, 563 F.3d 935, 948 (9th Cir. 2009).

25              **2.     Discussion**

26                   **a.     Failure to Provide Reasonably Effective
                              Assistance as to Competency**

27

28       At the outset, the Court notes that a defendant may not waive his due

24

1   process right not to be convicted while incompetent.  "[I]t is contradictory to argue

2   that a defendant may be incompetent, and yet knowingly or intelligently 'waive'

3   his right to have the court determine his capacity to stand trial."  Pate v. Robinson,

4   383 U.S. 375, 384 (1966); see also Cooper v. Oklahoma, 517 U.S. 348, 354 (1996)

5   (noting, "We have repeatedly and consistently recognized that the criminal trial of

6   an incompetent defendant violates due process" (internal quotation omitted));

7   Cacoperdo v. Demosthenes, 37 F.3d 504, 510 (9th Cir. 1994) (same); Bouchillon,

8   907 F.2d at 592 (observing, "Due process prohibits the conviction of a person who

9   is mentally incompetent.  This constitutional right cannot be waived by the

10   incompetent -- by guilty plea or otherwise" (internal quotations and citation

11   omitted)).  Even where, as here, a defendant has "expressed [his] wish to be found

12   competent and enter a guilty plea," counsel may nevertheless provide

13   constitutionally ineffective assistance.  Hull v. Kyler, 190 F.3d 88, 93-94 (3d Cir.

14   1999) (holding counsel's failure to cross-examine government witness or to offer

15   independent evidence of incompetence of defendant who wished to be found

16   competent and plead guilty constituted ineffective assistance, where defendant was

17   previously adjudicated incompetent).

18       While a client's choices about the direction the litigation should take may

19   influence the reasonableness of counsel's actions, see Strickland, 466 U.S. at 691,

20   that influence is circumscribed where the client's competency is at issue.  Where

21   there are "sufficient indicia of incompetence to give objectively reasonable

22   counsel reason to doubt the defendant's competency," counsel must "request the

23   trial court to order a hearing or evaluation on the issue of the defendant's

24   competency."  Jermyn v. Horn, 266 F.3d 257, 283, 301 (3d Cir. 2001) (holding

25   petitioner did not establish ineffective assistance of counsel where first trial

26   counsel retained expert to examine petitioner's competence and subsequent trial

27   counsel was apparently aware of his report) (citation omitted); see also

28   Bouchillon, 907 F.2d at 593, 597 (observing, "Where a condition [such as Post

Traumatic Stress Disorder] may not be visible to a layman, counsel cannot depend on his or her own evaluation of someone's sanity once he has reason to believe an investigation is warranted because, where such a condition exists, the defendant's attorney is the sole hope that it will be brought to the attention of the court") (emphasis omitted).

Indeed, "the Supreme Court has implied that defense counsel has a special role in effectively ensuring that a client is competent to stand trial." Hull, 190 F.3d at 112 (citing Drope v. Missouri, 420 U.S. 162, 177 n.13 (1975)). "If a client forecloses certain avenues of investigation, it arguably becomes even more incumbent upon trial counsel to seek out and find alternative sources of information and evidence, especially in the context of a capital murder trial." Douglas v. Woodford, 316 F.3d 1079, 1086 (9th Cir. 2003) (holding defendant was prejudiced at penalty phase, but not guilt phase, of trial, by counsel's failure to discover and introduce expert testimony regarding potential inability to premeditate and deliberate). "'An attorney cannot blindly follow a client's demand that his [mental state] not be challenged . . . and end[] further inquiry regarding [the defendant's] mental fitness when [the defendant] refused to submit to psychiatric examination.'" Id. (quoting Agan v. Singletary, 12 F.3d 1012, 1018 (11th Cir. 1994)).[6]

Here, Attorney Jones did precisely as the Ninth Circuit found to be error in Douglas: by his own testimony, he "aborted . . . any attempt to develop any kind of mental profile because Ronnie simply stopped cooperating." (9/27/07 E.H.T. 50-51.) Despite "belie[ving] that there was a substantial mental defense that could have been pursued in this case," receiving a "written evaluation of petitioner" from a mental health expert that "confirmed" his belief, and recognizing that Petitioner "just stop[ped] cooperating" with competency evaluations, Attorney Jones

---

[6] Compare Chavez v. United States, 656 F.2d 512, 519-20 (9th Cir. 1981) (holding defendant who "did not wish to pursue the matter" at competency hearing was not unconstitutionally deprived of an opportunity to do so), overruled on other grounds, Godinez v. Moran, 509 U.S. 389 (1993).

declared that:

> [d]ue to petitioner's insistence on foregoing any such defenses in favor of pleading guilty, I did not pursue investigation or development of a mental defense to the charges.  I made no use of Dr. Jones's evaluation of petitioner . . . in connection with the question of petitioner's competency. . . .  I felt effectively stonewalled in the presentation of any mental defense by petitioner's obdurate refusal to cooperate in the presentation of such a defense.

(Evid. Hr'g Exs. R2-A at ¶¶ 15-16; R2-B at 27-28.)  Notably, Attorney Jones was also "concerned about threats petitioner made that he would disrupt proceedings in court if her were not permitted to plead guilty."  (J. Br. at 29 ¶ 54.)

   In the midst of the proceeding in which Deere changed his plea to guilty, the trial court addressed Attorney Jones and stated, "He's [Deere's] not going to cooperate with you in any sense of the word in his defense.  He already has established that.  He may not be competent."  (9/26/07 E.H.T. 118-20 (emphasis added).)  In response, Attorney Jones told the court, "Your Honor, I have spent a great deal of effort and time investigating the possibility of [an] insanity defense or some other mentally related defense.  It is my firm conclusion there is no such defense."  (Evid. Hr'g Ex. R2-C at 167-68.)  When questioned about the veracity of that statement to the court, Attorney Jones responded that he:

> was trying to stretch the record as far as [he] could to protect Deere.  There was a district attorney standing right there next to me that at any point in time could jump up and say, 'Time out.  Let me cross-examine Mr. Jones as to what he means by what he's saying.'  The judge at any point can say, 'Time out.  I have a problem here in accepting this.' . . . I was in a great deal of heightened emotion at that point, frightened, I guess, that the whole thing would blow up in my face at any minute.

(Id. at 140-41.)  Attorney Jones explained his strategy that:

> if I can do something that is so – I don't know if I can use the term 'outrageous,' but, in effect, cause as much grief to appellate counsel and appellate courts as I have gone through in handling that case, maybe something at some point is going to prolong this guy's life.  That's really what it boiled down to for me.

(Id. at 139-40.)  He testified that informing the trial court at Deere's guilty plea

that there was no insanity or mental defense was borne out as a good strategy by the fact that "this proceeding, this process is continuing until this date," in capital habeas proceedings. (Id. at 149-50, 168.) He stated:

> I knew by pleading guilty it would set in motion the process that . . . appellate judges would struggle with this case for years, and I felt that was the best hope of some court at some point simply saying, 'We cannot permit this.' . . . My hope was that maybe at some point a court would stop the proceedings, and at that point, if enough time had gone by, if the D.A. decided that since maybe the case could not or should not be retried for some reason, agree to an LWOP, agree to something less than death . . . . That was my hope as to the best possible scenario. . . . [T]hat, as best as I can state it, was my plan . . . .

> I just wanted to present a difficult and troubling issue to the appellate process, something that would make people stop and think and rethink and take their time and hopefully at some point decide that this is not a proper way to handle a capital case.

> Not saying that I was personally incompetent. Of course, I would never want myself to be found incompetent as counsel, but at some point that procedure is not appropriate.

(Id. at 203-04, 206.)

Elsewhere, Attorney Jones commented on Deere's lack of cooperation surrounding his guilty plea, beyond his refusal to participate in a competency evaluation. Attorney Jones observed that Deere "has never even on any occasion asked my opinion on anything in connection with this case. . . . Deere has never ever asked for guidance," (1986 RT 43-44), and "would never discuss the facts of the case, never ever." (Evid. Hr'g Ex. R2-B at 11.) Attorney Jones testified that he "wanted [to] talk about the case, the facts of the case, go over the crime reports, go over the witness reports and discuss strategy and possible defenses, and it was just like beating my head against a brick wall. He [Deere] just would not discuss it." (Evid. Hr'g Ex. P8-B at 10 ¶ 36; see also J. Br. at 29 ¶ 54). Attorney Jones declared in 1993, "Dealing with petitioner and his demand to be executed was a

1    bewildering experience.  I felt like I was dealing with something beyond

2    comprehension.  In fact, I was in a fugue-like state myself by the time of the guilty

3    pleas.  This is the one case in my fifteen years as a deputy public defender which

4    haunts me." (Evid. Hr'g Ex. R2-A at ¶ 13.)  While Attorney Jones declared that he

5    "found no indication that petitioner's desire to plead guilty and obtain the death

6    penalty had anything to do with a death wish or that there was any suicidal

7    impulse behind [it]," he also stated, "I found myself engaged in a difficult and

8    deadly game of wits with petitioner, who was almost mesmerizing and very much

9    controlled our conversations.  In the end, petitioner persuaded me that his

10   decisions about his life and how to proceed in this case were his business and ones

11   to which I should defer."  (Id. at ¶ 12.)

12        Attorney Jones determined that Deere was merely unwilling, and not

13   unable, to cooperate with counsel based in part upon an erroneous estimation of

14   Deere's intelligence and overall mental health.  He explained:

15            [Deere] is a fascinating guy.  He's very intelligent, and
             he's very articulate, but he's not well educated . . . .  I'd
16            go back the next day, and it would be a rerun of the same
             thing over and over again, and his position just would
17            not budge.  He absolutely would not budge.  And just
             over time I became to realize or began to accept that this
18            is an intelligent man.

19   (Evid. Hr'g Ex. R2-B at 16-17.)  Contrary to Attorney Jones's lay opinion, Dr.

20   Jones found upon testing Deere that his full scale IQ was 77, in the seventh

21   percentile of full scale IQ and in the "borderline" (implying borderline retarded)

22   range, according to Dr. Jones.  (9/25/07 E.H.T. 15-16; Evid. Hr'g Ex. P1-A.)

23   Deere's verbal score was 76, in the sixth percentile and also in the borderline

24   range, and his performance IQ was 85, in the low average range.  (9/25/07 E.H.T.

25   15-16; Evid. Hr'g Ex. P1-A.)

26        The unreliability of Attorney Jones's opinion of Deere was confirmed by a

27   number of experts.  Dr. Rosenthal opined that Mr. Jones would not have been

28   equipped to make a reliable determination of Deere's competency.  (9/25/07

29

E.H.T. 92-93, 99-100, 109-11.)  Drs. Rosenthal and Stewart generally observed the ineptness of trial counsel to render an accurate assessment of a client's mental state.  Dr. Rosenthal testified that it can be "very difficult for a layperson" to assess the nature of a person's contact with reality and the subtleties of his or her mental state.  (Id. at 99-100, 109-10.)  Similarly, Dr. Stewart noted that "[t]here certainly is a range of appreciation of mental illness among trial attorneys.  I get involved in many trainings for attorneys, and I'm surprised at the level of naivete at this."  (10/9/07 E.H.T. 149-50.)  Dr. Stewart noted that "people in the criminal justice system will go to great lengths to hide the severity of mental illness where, in fact, their behavior is incompetent, but it's not seen that way [because observers] don't see it as mental illness."  (Id. at 152.)

Virtually every witness testifying at Deere's evidentiary hearing raised a laundry list of "red flags" that should have alerted Attorney Jones to Deere's highly questionable mental state – and, by inference, to the need for a professional competency assessment.  Dr. Jones believed it was naïve for Mr. Jones to take Deere "at face value."  (9/25/07 E.H.T. 59.)  Dr. Jones saw "red flags" in Deere's severe mutilation, chronic history of drug and alcohol abuse, dissociative state at the time of the homicide and thereafter, and family history; in his bizarre behavior, including cutting up a cow he poached, eating raw birds, and drinking ditch water; and in his unfortunate upbringing, including the possible intake of pesticides, consumption of toxic water, and electrocution.  (Id. at 60-61.)  Mr. Philipsborn also saw several "red flags" that "would have been immediately apparent that [Mr. Jones] should have been alerted to very early in the case."  (9/26/07 E.H.T. 103.)  Social worker Virginia Erickson Tiernan saw warning indicators where "someone is cutting on themselves or they're talking about suicide and methodology . . . ."  (9/25/07 E.H.T. 161-62.)  Ms. Tiernan "saw that [Deere] had psychiatric problems from the first moment [she] looked at him," and his condition accelerated from there.  (Id. at 9-11, 172.)  Dr. Favazza noted that Deere's "fresh mutilations" were

1   "a red flag" and concurred that Mr. Jones should not have taken "at face value"

2   Deere's proffered reasons for wanting the death penalty.  (9/26/07 E.H.T. 36-37,

3   60-61.)  Dr. Favazza noted Deere's "history of falsifying things," including

4   Deere's claim that his self-mutilations were part of a Native American ritual.  (Id.

5   at 36-37.)  Dr. Favazza testified that Deere's proffered reasons were

6   rationalizations for fulfilling a desire to be killed that he has stated since age 11.

7   (Id.)

8        In light of these red flags, Mr. Philipsborn testified that Attorney Jones

9   failed to adequately investigate "extraneous material bearing on competency."  (Id.

10  at 95.)  Mr. Philipsborn explained that in 1982, it would have been "incumbent

11  upon the attorney in a case like this not merely to interview the client, but obtain

12  all extraneous reports, subpoena witnesses, psychiatric records if there are any,

13  relationships with the accused person."  (Id. at 93.)  Mr. Philipsborn "didn't see a

14  strong linkage between what Mr. Jones did and what the requirements of the

15  standards and the case law seemed to discuss."  (Id. at 91-93.)  "[W]ith respect to

16  Lawyer Jones' duty to obtain discovery," Mr. Philipsborn believed he "was

17  deficient when measured up to the standard of practice that then existed."  (Id. at

18  95.)  Mr. Philipsborn also opined that if Attorney Jones were in a "fugue like

19  state," as Attorney Jones testified he was, "there would be a serious question about

20  whether that lawyer should be representing that client in that case."  (Id. at 113;

21  Evid. Hr'g Ex. R2-A at ¶ 13.)

22       Mr. Philipsborn presented evidence that, among other things, Attorney

23  Jones's agreement to "go along with [Deere's] wishes to plead guilty . . . rendered

24  the client ineffectively represented" by the community's standards in 1982.  (See

25  id. at 108-09, 149-50.)  Mr. Philipsborn was familiar with the Riverside County

26  community in 1982 as a result of a capital case he defended.  (Id. at 108-09.)  He

27  was "aware of the fact that there were some well thought out, well respected,

28  independent minded mental health professionals available in Riverside County

31

who worked on capital cases and had been enlisted to conduct evaluations of capital defendants in Riverside County in 1982." (Id.)  Mr. Philipsborn felt strongly that at a minimum, Attorney Jones should have sought to have a qualified forensic expert evaluate Deere's competency after the court questioned Attorney Jones about Deere's competency.  (Id. at 110.)

Mr. Philipsborn was highly critical of Attorney Jones's representation to the trial court that he had "spen[t] a great deal of effort and time investigating" mentally related defenses, without obtaining a competent competency evaluation. (J. Br. at 29, ¶ 54; 9/26/07 E.H.T. 110, 152.)  Deere's response to the court's questioning, made as an officer of the court, was to Mr. Philipsborn "a major flaw, and . . . certainly a violation of an ethical duty . . . ."  (9/26/07 E.H.T. 110, 152.)[7] Mr. Philipsborn believed Attorney Jones was attempting "to dignify Mr. Deere's instructions to counsel which . . . in a professional sense and in the sense of obligations to the court system overall was simply not – I mean, it was just not a truthful way to go."  (Id. at 118-21.)

Dr. Dietz stated his belief that Attorney Jones was truthful with the trial court, and noted that his conclusions about Deere's competency were based in part upon the assumption that Attorney Jones's representations to the court were truthful.  (See 10/9/07 E.H.T. 83-84, 90.)  Dr. Dietz testified that his "belief was that . . . Mr. Jones had communicated his findings about his client . . . to the satisfaction of the court based on contemporaneous, thoughtful, repetitive observation.  But I can't tell you my independent judgment . . . without relying on the observations of Mr. Jones, Dr. Bolger, and Dr. Jones . . . and the trial judge." (Id. at 83-84.)  He explained:

> The issue is did Mr. Jones accurately and adequately represent in his statements to the court and I think in some sworn statements what his client has said and

_____

[7]  Attorney Jones also permitted Deere to misinform the trial court that he had told Attorney Jones all the facts and circumstances of the case, when in fact, by Attorney Jones's own testimony, Deere "would never discuss the facts of the case, never ever."  (J. Br. at 28-29 ¶ 54; Evid. Hr'g Ex. R2-B at 11.)

meant and wanted.  And if Mr. Jones was conveying truthfully what his client's position was and what his client wanted in those contemporaneous and more proximal proceedings, Mr. Jones' statements at the time were persuasive to me that his client was then competent.  If Mr. Jones was misrepresenting his client, then some of my most valuable evidence evaporates, and I wouldn't be able to form an opinion.

(Id. at 90.)

This Court does not question that "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense." Medina, 505 U.S. at 450; see also Boyde v. Brown, 404 F.3d 1159, 1167 (9th Cir. 2005); Williams v. Woodford, 384 F.3d 567, 608 (9th Cir. 2004).  Here, however, counsel "belie[ved] that there was a substantial mental defense that could have been pursued in this case," received a "written evaluation of petitioner" from a mental health expert that "confirmed" his belief, and recognized that Petitioner "just stop[ped] cooperating" with competency evaluations.  (Evid. Hr'g Exs. R2-A at ¶ 15, R2-B at 27-28.)  Attorney Jones's assessment of Deere's competency was unreliable, (see 9/25/07 E.H.T. 15-16, 59, 92-93, 99-100, 109-11; 9/26/07 E.H.T. 36-37, 60-61; Evid. Hr'g Ex. P1-A), and "the opinion of [defense] counsel certainly is not determinative." Hernandez v. Ylst, 930 F.2d 714, 718 (9th Cir. 1991).  Moreover, a "defendant's inability to assist counsel can, in and of itself, constitute probative evidence of incompetence . . . ." Medina, 505 U.S. at 450; see also Eddmonds v. Peters, 93 F.3d 1307, 1317 (7th Cir. 1996) (observing, "Since we are considering [petitioner's] capacity to assist in his defense . . . whether he in fact assisted in his defense at trial, while not dispositive, is highly relevant.")  The competent mental health expert examining Petitioner at the time of his guilty plea concluded that Deere was "disabled" from cooperating in his defense and "was not able to deal with . . . . discussing . . . the death penalty and the issues pertaining to the crime itself." (Evid. Hr'g Exs. P1-B at 3, R3 at 67.)  Dr. Jones's credible conclusion is consistent with the testimony of Petitioner's trial counsel that Petitioner never

33

1   discussed the facts of the case with him and never asked for his guidance.  (See
2   Evid. Hr'g Ex. R2-B at 11; 1986 RT 43-44.)

3       Petitioner has submitted sufficient evidence of the need for an adequate
4   competency evaluation for this Court to find that trial counsel did not represent
5   Petitioner at an objective standard of reasonableness and performed below the
6   professional standard in his community at the time, when he represented Petitioner
7   regarding his competence to stand trial and to plead guilty.

8                   **b.    Prejudice to the Defense**

9       As set forth below, the Court also finds a reasonable probability that, but for
10  counsel's unprofessional errors, Deere would have been found to be unable to
11  assist counsel in the conduct of a defense in a rational manner at the time of his
12  guilty plea, as a result of mental disorder.

13                   **(1)    Dr. Bolger's Reports**

14      First, the Court notes that it does not credit the reports that issued from Dr.
15  Bolger's contemporaneous interviews of Petitioner.  As discussed above, Dr.
16  Bolger had no formal psychiatric training whatsoever, misrepresented to the Court
17  that he was board certified, and failed to disclose and made misrepresentations to
18  the Court regarding his prior interview(s) of and conclusions about Deere.  (See
19  supra pp. 13-15.)  Dr. Bolger's March 1982 report, at the time of its issue, was not
20  credited by Deere's attorney or by Dr. Jones.  (Evid. Hr'g Ex. R3 at 55-58.)  Dr.
21  Bolger's March and June 1982 reports fared no better before the other experts
22  testifying at Deere's evidentiary hearing, who consistently discounted Dr. Bolger's
23  opinions.  Dr. Park Dietz, the state's expert, "discount[ed] his [Dr. Bolger's]
24  opinions because of his credentials and his inflation of them."  (10/9/07 E.H.T. 30.)
25  Dr. Dietz explained that since Dr. Bolger "was not, in fact, a psychiatrist," he "did
26  not want to rely on [Dr. Bolger's] psychiatric opinions because they weren't really
27  psychiatric opinions."  (Id. at 89.)  Dr. Dietz testified that it was inadequate for Dr.
28  Bolger to rely upon Deere himself as the sole source of information.  (Id. at 31.)

1   Dr. Favazza also faulted Dr. Bolger for failing to take Deere's family history and

2   background into account.  (9/26/07 E.H.T. 38.)  He opined overall that "Dr. Bolger

3   was totally wrong.  The shallowness of his understanding is stunning." (Id. at 38.)

4       Dr. Rosenthal likewise testified that "Dr. Bolger shows a fair amount of

5   ignorance of some of the basic ideas of psychiatry and possibly it's because he

6   never had the formal training, never had the residency and this would be one

7   example of that."  (9/25/07 E.H.T. 79.)  Dr. Rosenthal did not know if Dr. Bolger's

8   assessment of Deere's competency was based "on an accurate assessment because

9   this is a man that I feel is not well-qualified or well-trained in the field of

10  psychiatry."  (Id. at 101.)  Dr. Rosenthal found Dr. Bolger unreliable and defective,

11  and had doubts about the conclusion Dr. Bolger came to about Deere's

12  competency.[8]  (Id. at 73, 104, 112.)  Dr. Rosenthal did not find that Dr. Bolger was

13  a reliable practitioner in the field of psychiatry because he exaggerated his

14  qualifications and "made statements that any qualified physician in psychiatry

15  would disagree with." (Id. at 83.)

16      Accordingly, the Court does not credit Dr. Bolger's reports as psychiatric

17  evaluations and does not base its findings upon them.

18              **(2)    Letters Written by Petitioner**

19      The Court likewise finds little instruction from the letters Deere wrote near

20  the time of his guilty plea.

21      While in custody, Deere wrote many letters to Cindy; a small number to

22  Kathy and to Deere's friend, Shelley Ackerman; and several to Deere's sister,

23  Jeannie Deere, among others.  (Evid. Hr'g Exs. P35-A(1)-(26), P35-B(1)-(11).)

24  Drs. Rosenthal and Dietz briefly analyzed the letters as contemporaneous evidence

25

26  _____

27  [8]   As explained below (infra p. 37, 37 n.11), Dr. Rosenthal, who examined Deere in 1992, concluded at that time that
     he "concur[red] in the conclusion of William Jones, Ph.D., who examined Mr. Deere at the time of his plea, and would
     have advised he was not competent to stand trial."  (Evid. Hr'g Ex. P7-C at ¶ 85.)  At the time of the evidentiary
28  hearing, Dr. Rosenthal did not recall giving this opinion, but said that it was his opinion in 1993. (9/25/07 E.H.T. 115-
     16.)

1   of Deere's state of mind.[9]  (See Evid. Hr'g Exs. P7-C at ¶ 84, R1-A at ¶¶ 29, 32.)

2        Dr. Rosenthal concluded that the letters show Deere's thought processes to

3   be illogical and disturbed.  (Evid. Hr'g Ex. P7-C at ¶ 84.)  Dr. Rosenthal viewed the

4   letters' "lengthy religious tracts, intended to assist Ms. Gleason in achieving eternal

5   salvation[,] the avid religious content of his writings[,] and the newly found

6   obsession with religion and salvation [as] strong clinical indicators of psychiatric

7   disturbance in a man who had not previously demonstrated such devotion . . . .

8   Indeed, his lifelong self-destructive tendencies may well have been exacerbated by

9   his hyperreligiosity, rendering them more overpowering than ever."  (Id.)

10       Dr. Dietz identified six reasons Deere offered for wanting to plead guilty, in

11  his letters from March 14, 1982 to June 21, 1982:  (1) pleading guilty would help

12  reunite Cindy and their daughter, Reyna; (2) pleading guilty would help Cindy,

13  Reyna, and Kathy move on with their lives; (3) pleading guilty would bring justice

14  to the victims' family; (4) Deere believed that "the death penalty is right" (citing

15  Evid. Hr'g Ex. P35-A(11) at 1); (5) pleading guilty would spare Cindy and Kathy

16  from testifying; and (6) Deere believed that he would go to heaven when he died

17  (citing Evid. Hr'g Ex. P35-A(18) at 2 (stating, "I can't wait to get to the other

18  world, that's why I don't care if I die, . . . I will be in a better plays [sic]")).  (Evid.

19  Hr'g Ex. R1-A at ¶ 29.)  Dr. Dietz concluded that these reasons for wanting the

20  death penalty showed Deere's decision to be "self-serving," not "self-destructive,"

21  and pointed toward competence, not incompetence.  (Id. at ¶ 32.)

22       As multiple experts observed, however, Deere was prone to rationalizations

23  and deceitfulness concerning his behavior and motivations.[10]  Even Dr. Dietz

24  observed that "[w]hen deceitfulness is one of the attributes of the disorder [like the

25       Antisocial Personality Disorder Dr. Dietz diagnosed in Deere], one has to use

26  _____

27  [9]  As noted below (infra n.11), no motion to strike any portion of Dr. Rosenthal's testimony was brought after the evidentiary hearing, and the Court overruled Respondent's objections to Dr. Rosenthal's declarations (Evid. Hr'g Exs. P7-B, P7-C).  (Order re Respondent's In Limine Motion, May 14, 2007, at 12 ¶ H(1).)

28  [10]  The Court also considers Deere's false testimony to the trial court that he had told Attorney Jones all the facts and circumstances of the case.  (See supra n.7.)

caution in taking the person and whatever reasons he articulates for whatever behavior as being valid." (9/27/07 E.H.T. 47-48.) Dr. Dietz implicitly admitted that Deere's "decision" to seek the death penalty, if rational, would have been made "at a particularly high level of functioning when compared to every other decision in his life that I know about." (10/9/7 E.H.T. 44.) Likewise, Dr. Jones remarked that he "[didn't] think [Deere] used his rational thinking of doing much of anything in his life, but he would offer rationalizations after the fact at times." (9/25/07 E.H.T. 42.) Dr. Favazza agreed that Deere's stated reasons were mere rationalizations for satisfying a desire to be killed that he has expressed since age 11, and noted Deere's "history of falsifying" the reasons for his self-mutilations. (9/26/07 E.H.T. 36-37, 60-61.) Dr. Stewart was also of the opinion that it was "more likely" than not that Deere did not reach his "decision" to seek the death penalty on "a higher level of moral standing." (10/9/07 E.H.T. 130-31, 133-34.)

Because the Court finds substantial reason to doubt the explanations Deere offered in his letters for desiring the death penalty, the Court declines to rely upon these letters in reaching its conclusions.

### (3)    Expert Opinions

The Court does find significant the opinion of Dr. Jones, who examined Deere within mere weeks of his guilty plea. Where "[i]t does not appear that the examining psychiatrist was asked to address himself to medical facts bearing specifically on the issue of petitioner's competence to stand trial, as distinguished from his mental and emotional condition generally," the Court may be called upon to address "the inferences that could or should properly have been drawn from the report." Drope, 420 U.S. at 176 (holding trial court was required to conduct competency hearing in light of petitioner's previous irrational behavior and suicide attempt during trial); see also Wood, 430 F. Supp. at 112 (finding ineffective assistance of counsel regarding competence where, inter alia, psychologist who examined petitioner shortly after conviction for a purpose other than competency

1   "found no evidence of mental illness," but "testified that had he been consulted for

2   the purpose of determining competency and if he had been informed of the details

3   of the crime he would have recommended a thorough examination prior to trial").

4        While "[b]elated opinions of mental health experts are of dubious probative

5   value and therefore, disfavored," "Dr. Jones's declaration . . . stands on different

6   footing."  Deere, 339 F.3d at 1086.  "[M]edical reports contemporaneous to the

7   time of the initial hearing," like those of Dr. Jones, "greatly increase the chance for

8   an accurate retrospective evaluation of a defendant's competence."  Moran v.

9   Godinez, 57 F.3d 690, 696 (9th Cir. 1995), superceded on other grounds by statute,

10  Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-

11  132, 110 Stat. 1214 (1996); see also McMurtrey v. Ryan, 539 F.3d 1112, 1131 (9th

12  Cir. 2008).  The Court, therefore, credits and gives substantial weight to Dr. Jones's

13  testimony.  The Court has also considered and evaluated the expert testimony of

14  Dr. Armando Favazza, Dr. Pablo Stewart, and Dr. Park Dietz, who testified at

15  Deere's evidentiary hearing based upon information available at the time of

16  Deere's guilty plea.

17       Dr. Dietz opined that Deere was competent and decided to plead guilty in

18  "the process of moral decision making," based upon Deere's "mental functioning,

19  the care with which he makes the decision, his ability to give a reasoned basis for

20  his decision, [and] his ability to state how his decision reflects his personal values

21  rather than those of Mr. Jones or the court or anyone else."  (10/9/07 E.H.T. 43-44).

22  As explained above (supra pp. 34-35), however, the Court discounts Deere's

23  proffered reasons for desiring the death penalty.  Even Dr. Dietz implied that a

24  rational decision to seek the death penalty, based upon high-functioning morality,

25  would be out of line with "every other [known] decision" in Deere's life.  (10/9/07

26  E.H.T. at 44.)

27       With respect to Deere's manifestation of self-serving versus self-destructive

28  motivation, Dr. Dietz testified that "there was a substantial issue raised by

1   [Deere's] experts and that needs to be further explored."  (Id. at 87.)  Deere's

2   experts consistently opined that Deere was not capable of cooperating with counsel

3   in the rational conduct of a defense.  Dr. Jones concluded that Deere was:

4
5           so bent on self-destruction that it disabled him from
            cooperating [] in a meaningful way with the presentation
6           of a defense . . . . [F]or example, he could not complete
            the evaluation, so he was not fully cooperative. . . .  [H]e
7           didn't complete it because he was not able to deal with
            the emotions about discussing the death penalty and the
8           issues pertaining to the crime itself. . . .  I don't recall any
            murder defendant I evaluated breaking off the evaluation
9           after we are into it and not completing it.  I thought that
            was unusual.

10  (Evid. Hr'g Ex. R3 at 67, 69-70 (internal quotations omitted, emphasis added).)

11  Dr. Jones testified that "when [Deere] stopped cooperating, it was not a choice."

12  (9/25/07 E.H.T. 138.)  Dr. Jones believed that Deere "was incompetent, and he

13  should have never pled."  (Id. at 61; see also id. at  144.)  Dr. Rosenthal, who

14  examined Deere in 1992, and Dr. Favazza both agreed with Dr. Jones's conclusions

15  that Deere had demonstrated his inability to cooperate with counsel in his defense

16  and was incompetent.  (See id. at 146; 9/26/07 E.H.T. 39, 44; Evid. Hr'g Ex. P7-C

17  at ¶¶ 60, 70, 84, 85.)[11]     At his evidentiary hearing, Petitioner's experts presented

18  evidence that Deere suffered from suicidality or depression, Post Traumatic Stress

19  Disorder, and a "fixed idea," and that each condition prevented him from assisting

20  his counsel in the conduct of a defense in a rational manner at the time of his guilty

21  plea.  The Court finds a reasonable probability that, but for counsel's

22
23  [11]  At the time he evaluated Deere, Dr. Rosenthal opined that "Mr. Deere suffers from the effects of organic brain damage.  His organic impairments affect him cognitively, neurologically, and behaviorally. . . .  There is substantial evidence that his thought processes were illogical and disturbed during the period of his incarceration."  (Evid. Hr'g
24  Ex. P7-C at ¶¶ 60, 70, 84.)  Dr. Rosenthal concluded, "In my professional opinion, which I hold to a reasonable degree of medical certainty, Mr. Deere's multiple mental impairments, exacerbated by pressures from his former girlfriend
25  and the conditions of his confinement, rendered him incompetent to rationally comprehend his trial proceedings or to aid and assist counsel at trial.  I concur in the conclusion of William Jones, Ph.D., who examined Mr. Deere at the
26  time of his plea, and would have advised he was not competent to stand trial."  (Id. at ¶ 85.)  At the time of the evidentiary hearing, Dr. Rosenthal did not recall giving this opinion, but said that it was his opinion in 1993.  (9/25/07
27  E.H.T. 115-16.)
        The Court allowed this testimony subject to a motion to strike, which was never brought.  (See id. at 114-15.)  The
28  Court overruled Respondent's objections to Dr. Rosenthal's declarations (Evid. Hr'g Exs. P7-B, P7-C).  (Order re Respondent's In Limine Motion, May 14, 2007, at 12 ¶ H(1).)

1    unprofessional errors, Deere would have been found incompetent to plead guilty as

2    a result of one or more of these conditions.

3                    (a)      Evidence of Depression/Suicidality

4           At the time of Deere's guilty plea, Dr. Jones diagnosed Deere as suffering

5    from, inter alia, an adjustment disorder with depressed mood.  (Evid. Hr'g Ex. P1-

6    A.)  Dr. Jones testified that he thought "Mr. Deere probably had a much longer

7    more severe depression going on," but he did not diagnose major depression

8    because Deere's abuse of alcohol and drugs clouded his symptoms.  (Evid. Hr'g

9    Ex. R3 at 60-61.)  Dr. Jones found that depression was indicated in the Thematic

10   Apperception Test he administered to Deere (9/25/07 E.H.T. 17; Evid. Hr'g Ex. P1-

11   A), and believed that Deere's depression pre-existed his arrest.  (9/25/07 E.H.T.

12   149.)  Dr. Jones observed that "[t]here are self-destructive inclinations, but they are

13   blocked from expression in suicide.  Some of his acting out behavior may have

14   been an effort to get others to kill him."  (Evid. Hr'g Ex. P1-A.)  Dr. Jones also

15   explained that "some of [Deere's] acting out behavior was quite provocative

16   towards others, and my belief was that he desired to be – to be killed.  And all of

17   this maybe was just a long, drawn out suicide attempt."  (9/25/07 E.H.T. 31.)

18          Another of Deere's mental health experts testifying at his evidentiary

19   hearing, Dr. Favazza, thought it clear that Deere suffered from both mild to

20   moderate as well as "serious profound depression."  (9/26/07 E.H.T. 20, 24-25.)

21   Dr. Favazza acknowledged that alcohol abuse makes other disorders difficult to

22   diagnose and can magnify the symptoms of depression, but believed that a dual

23   diagnosis of alcoholism and severe depression was appropriate.  (Id. at 20-22.)  Dr.

24   Favazza stated that "the core of Mr. Deere's psychopathology is depression, a

25   serious profound depression, and what has come out of that, what has manifested

26   itself out of that has coalesced into a fixed pathological, this morbid idea of I must

27   be killed."  (Id. at 24-25.)  Dr. Favazza believed that Deere was unable to consult

28   with his attorney with a reasonable degree of rational understanding and could not

40

1   rationally assist with the preparation of his defense.  (Id. at 60, 67-68.)

2       Dr. Dietz, the state's expert, noted Deere's "recurrent suicidal behavior"

3   (Evid. Hr'g Ex. R1-D at 49), and observed that Deere may have been "always

4   kind of on the edge of suicide . . . .  He certainly acts as though that were so, and

5   it might be true."  (Evid. Hr'g Ex. R1-E at 215.)  Dr. Dietz attributed Deere's

6   suicidal thoughts and behaviors more to an antisocial point of view than to

7   depression.  (Evid. Hr'g Ex. R1-D at 57.)  He cautioned that he "would never

8   leap to the inference" that Deere had a "persistent desire to be killed based on the

9   fact that on five occasions [he] stated a desire to be killed."  (10/9/07 E.H.T. 162-

10  63.)  Dr. Dietz believed instead that Deere may have wanted "the attention that

11  that phrase brings about or some response to saying such a thing or some other

12  goal."  (Id.)  That said, Dr. Dietz agreed that depression was a factor in Deere's

13  case.  (Id. at 37-40.)  Dr. Dietz noted that Petitioner "has certainly shown signs

14  and symptoms consistent with some level of depression at various times in his

15  life, particularly in response to losses . . . ."  (Evid. Hr'g Ex. R1-A at ¶ 17.)  Dr.

16  Dietz agreed with Dr. Jones's contemporaneous assessment that Deere suffered

17  from an adjustment order with depressed mood, and explained that such a

18  condition is not a major depression, but a reaction to circumstances.  (10/9/07

19  E.H.T. at 37-38.)  Dr. Dietz stated that, pre-arrest, Deere could have indeed

20  suffered from a recurrent major depression, but he did not have enough evidence

21  to evaluate to come to a definite conclusion to that effect.  (Id. at 38.)  Dr. Dietz

22  took issue with "merely a technical question of what to call [Deere's] pre-arrest

23  depression."  (Id. at 48-49.)  He found that he had no evidence to evaluate any

24  post-arrest depression Deere may have had.  (Id.; see also Evid. Hr'g Ex. R1-A

25  at ¶ 17.)

26      As to Deere's competence in light of "some level of depression at various

27  times in his life" and his "recurrent suicidal behavior," Dr. Dietz testified that if

28  Deere were unable "to assist with counsel in preparation of a defense to the

charge," and had "an inability to cooperate caused solely by a mental disorder that leads him to want to be killed, that would be incompetence." (Evid. Hr'g Exs. R1-D at 21, 49, R1-A at ¶ 17.)  Dr. Dietz testified that "[i]f the principal basis on which a person choses [sic] not to defend against capital charges were depressive hopelessness and wished [sic] to die due to suicidality, in most of the circumstances that I can think of that would be incompetent."  (Evid. Hr'g Ex. R1-D at 23.)  If "a person is suicidal as a result of mental disease or defect and, therefore, abandoning appropriate legal strategies to fulfill a mentally diseased desire to die," Dr. Dietz opined, "[t]hat could certainly render a person incompetent.  I'm not sure there's any exception."  (Id. at 11.)

Dr. Pablo Stewart concluded that Deere had depression, based upon Deere's "sleep difficulties[,] . . . weight loss . . . sadness, feeling sad, suicidal ideation and symptomatic complaints, the headaches which are associated symptoms of a depressive condition."  (10/9/97 E.H.T. 119-20.)  Though Dr. Stewart was unable to determine whether Deere's depressive condition rose to the level of a Major Depressive Disorder because of Deere's ongoing substance abuse, Dr. Stewart stated that Major Depressive Disorder was his "clinical hunch."  (Id.)  That impression was based in part on his "absolute opinion" that Deere suffers from Post Traumatic Stress Disorder.  (Id. at 120.)  Dr. Stewart concluded that Deere's "pleading guilty and wishing to be executed was not an independent decision but rather colored by, affected by and was a result of his underlying psychiatric condition."  (Id. at 124.)  Dr. Stewart expressed his opinion that Deere's guilty plea and desire to be executed were "due to a combination of mental disease and defect, and he was unable to rationally assist counsel in his own defense at that time."  (Id. at 130, 132, 145.)  Dr. Stewart opined that Deere's repeatedly expressed desire to be killed and suicidal ideation "speak[] to his not wishing to put up any sort of legal defense and accepting the plea and wishing to be executed."  (Id. at 110, 144.)

1          (b)      Evidence of Post Traumatic Stress Disorder

2          Deere's experts also presented evidence that Deere suffered from Post

3  Traumatic Stress Disorder.  Post Traumatic Stress Disorder was a recognized

4  disorder in 1982, and was included in the Diagnostic and Statistical Manual of

5  Mental Disorders, Third Edition (DSM-III), issued in 1980.  Am. Psychiatric

6  Ass'n, Diagnostic & Statistical Manual of Mental Disorders 236-38 (3d ed. 1980);

7  see also Bouchillon, 907 F.2d at 594-95 (upholding finding that Post Traumatic

8  Stress Disorder, "a clinically recognized, mental disorder," rendered petitioner

9  incompetent to plead guilty in 1982).  The DSM-III provided:

10          Post-traumatic Stress Disorder, Chronic or Delayed

11          The essential feature is the development of characteristic
           symptoms following a psychologically traumatic event
12         that is generally outside the range of usual human
           experience.

13
           The characteristic symptoms involve reexperiencing the
14         traumatic event; numbing of responsiveness to, or
           reduced involvement with, the external world; and a
15         variety of autonomic, dysphoric, or cognitive
           symptoms. . . .
16
           Symptoms of depression and anxiety are common, and in
17         some instances may be sufficiently severe to be
           diagnosed as an Anxiety or Depressive Disorder.
18         Increased irritability may be associated with sporadic and
           unpredictable explosions of aggressive behavior, upon
19         even minimal or no provocation. . . .

20         Symptoms may begin immediately or soon after the
           trauma.  It is not unusual, however, for the symptoms to
21         emerge after a latency period of months or even years
           following the trauma. . . .
22
           Emotional lability, depression, and guilt may result in
23         self-defeating behavior or suicidal actions.  Substance
           Use Disorders may develop. . . .
24
           If an Anxiety, Depressive, or Organic Mental Disorder
25         develops following the trauma, these diagnoses should
           also be made.
26

27  Am. Psychiatric Ass'n, supra p. 41, at 236-37.

28          Dr. Stewart concluded that Deere's primary condition was Post Traumatic

43

Stress Disorder.  (10/9/07 E.H.T. 129.)  Dr. Stewart saw Deere's lack of

cooperation with Dr. Jones as signaling "the avoidance prong of Post Traumatic

Stress Disorder [that] is so major in this case," and pointed out that Deere failed to

cooperate with his psychiatric evaluations.  (Id. at 132-33.)  Dr. Stewart believed

that Deere's Post Traumatic Stress Disorder, in conjunction with his history of

substance abuse, self mutilation, organic syndrome, and depression, fueled his

inability to assist counsel and to think rationally.  (Id. at 132-34.)  Dr. Stewart

believed that Deere's "desire to plead guilty and accept the death penalty was due

to a combination of mental disease and defect, and he was unable to rationally

assist counsel in his own defense at that time."  (Id. at 131.)

Dr. Dietz acknowledged that Deere "was certainly a candidate for developing

Post-Traumatic Stress Disorder."  (Id. at 58.)  Dr. Dietz thought the possibility that

Deere had Post Traumatic Stress Disorder that caused him to want to avoid the trial

process at all costs was "an interesting theory that I would want to explore further

and would want to reanalyze the data to consider."  (Evid. Hr'g Ex. R1-E at 214.)

He testified that it was "possible for a person to go through the development of a

post-traumatic stress disorder [and] have such a profound need to avoid re-

experiencing an event that the individual will engage in irrational and self-defeating

avoidance."  (Id.)

Dr. Dietz felt that he had no evidence to evaluate concerning any Post

Traumatic Stress Disorder Deere was experiencing in connection with his guilty

plea, but named four factors, among others, that could have been examined to make

a determination of whether Deere had "Post Traumatic Stress Disorder that would

cause him to be so avoidant of the trial that he would go to the extreme lengths he

did to avoid being traumatized in court:"  (1) troubling dreams about the events he

would expect to be aired at trial or in a mitigation hearing; (2) avoidance of

discussing or being exposed to the events he would expect to be aired in court; (3)

exaggerated startle response or psychological reactivity in the presence of potential

witnesses; and (4) intrusive memories of the events he would expect to be aired in court.  (10/9/07 E.H.T. 56-57; see also id. at 59-60.)  Dr. Dietz opined that there was not enough "evidence of signs and symptoms of Post Traumatic Stress Disorder . . . for anyone to base a diagnosis on it, but I do think he has had enough [signs and symptoms] for someone to have a good hunch in that direction."  (Id. at 160.)

(c)   Evidence of a Fixed Idea

Dr. Favazza concluded that Deere had a fixed or pathological idea, formed in early childhood, that he wanted to die:  he "ha[d] a fixed – a pathological fixed idea that he must be killed."  (9/26/07 E.H.T. 22-23.)  A fixed idea is "set in concrete" and "nothing is going to budge it," Dr. Favazza explained.  (Id. at 22.)  Though fixed ideas are rare, Dr. Favazza concluded that Deere held a fixed idea "related to experiences in his early childhood, especially his depression."  (Id. at 24, 53.)  Dr. Favazza opined:

> This idea I think formulated in early childhood has remained with him to this very day and is a core, central, pathological idea and is preventing him from cooperating with his counsel.  He just wants to die, and he's in a perfect situation right now because he can have the state kill him, and this is what he wants.

(Id. at 23.)  "[I]n regards to this idea, [Deere] has no free will.  He cannot – he cannot deliberate upon it and say 'I choose not to have this idea anymore.'"  (Id. at 23-24 (emphasis added).)  As a result, Dr. Favazza testified that Deere "has consistently refused to cooperate fully with attorneys in preparing a defense" as "a product of his mental illness," not of his own free will.  (Id. at 24-25.)

In light of the expert testimony advanced at his evidentiary hearing, Deere has demonstrated a reasonable probability that he would have been found to suffer from a mental disorder had Attorney Jones adequately developed the issue at the time of Deere's guilty plea.

The Court, therefore, finds that Petitioner has established his right to relief

1   based upon ineffective assistance of counsel.  Petitioner has demonstrated that trial

2   counsel's conduct rendered the proceedings unable to be "relied on as having

3   produced a just result," and that there is a reasonable probability, sufficient to

4   undermine confidence in the outcome, that he would have been found incompetent.

5   See Strickland, 466 U.S. at 686, 694.  Accordingly, the Court **GRANTS** federal

6   habeas relief on Claim 6(b) and (c).

7   **B.    Actual Incompetence to Assist Counsel and Defend Against**
    **Capital Charges, and to Enter a Knowing, Intelligent, and**
8   **Voluntary Guilty Plea:  Claims 1 and 4**

9        Because Deere is entitled to relief on his claim of ineffective assistance of

10  counsel, the Court need not, and does not, reach Deere's claims of actual

11  incompetence to assist counsel and defend against capital charges, and to enter a

12  knowing, intelligent, and voluntary guilty plea.

13       Where a petitioner is entitled to relief based upon ineffective assistance of

14  counsel, the court need not reach his or her claim of actual incompetence.  See, e.g.,

15  McMurtrey v. Ryan, 539 F.3d 1112, 1117, 1132 (9th Cir. 2008), aff'g No. 88-844

16  (D. Ariz. Mar. 4, 2003) (holding that counsel's failure to provide effective

17  assistance and trial court's failure to order a hearing on competency were

18  dispositive, and declining to rule on petitioner's claim of actual incompetence);

19  Bouchillon, 907 F.2d at 595 (holding trial counsel provided ineffective assistance

20  without deciding actual competency or incompetency); Wood, 430 F. Supp. at 113

21  (noting, "[T]he Court does not conclude that [petitioner] was incompetent to stand

22  trial. . . .  This is, of course, not this Court's responsibility.  The Court does

23  conclude, however, that facts known or reasonably ascertainable by counsel prior to

24  trial were sufficient to inject these issues in the case . . . [and c]ounsel's failure to

25  do so rendered his assistance ineffective").

26       As set forth above, the Court finds that Deere has established his claim of

27  ineffective assistance of counsel (Claim 6(b) and (c)), and grants relief on that

28  basis.  The Court, therefore, does not reach the issue of Deere's actual competence

1   or incompetence, upon which his Claims 1 and 4 are based.  The Court

2   **DISMISSES AS MOOT** Claims 1 and 4.

3        **C.    Constitutional Inadequacy of Psychiatric Evaluation:  Claim 3**

4        When a defendant "is able to make an ex parte threshold showing to the trial

5   court that his sanity is likely to be a significant factor in his defense," he has a

6   constitutional right to "access to a competent psychiatrist who will conduct an

7   appropriate examination and assist in evaluation, preparation, and presentation of

8   the defense."  Ake v. Oklahoma, 470 U.S. 68, 82-83 (1985).

9        While a court will not countenance "battles of psychiatric opinions"

10  constituting "a psychiatric medical malpractice review in a federal habeas

11  proceeding," Harris v. Vasquez, 949 F.2d 1497, 1518 (9th Cir. 1991) (internal

12  quotation omitted), a psychiatrist may be sufficiently unqualified that his or her

13  opinion is constitutionally infirm.  See Silagy v. Peters, 713 F. Supp. 1246, 1250

14  (C.D. Ill. 1989) (holding, "Ake merely requires that to be 'competent,' the

15  psychiatrist appointed by the court must be experienced and board certified"), aff'd,

16  905 F.2d 986, 1013 (7th Cir. 1990) (denying federal habeas relief because "three

17  experienced, board-certified, independent practicing psychiatrists were appointed,"

18  but recognizing that experts must be constitutionally adequate under Ake (emphasis

19  added)); In re Gay, 19 Cal. 4th 771, 798 (1998) (same, as to state habeas relief);

20  Doe v. Superior Court, 39 Cal. App. 4th 538, 546 (1995) (holding psychiatric panel

21  members who had no expertise in disorders relevant to the defense were not

22  competent under Ake), disapproved on other grounds, James G. v. Superior Court,

23  80 Cal. App. 4th 275 (2000) (regarding county counsel's representation of trial

24  court).  Under California law, even licensed psychologists and board certified,

25  licensed psychiatrists, all with at least five years of post-doctorate experience, are

26  not constitutionally competent if they lack any expertise in the conditions at issue

27  for the defendant.  Doe, 39 Cal. App. 4th at 546; see also In re Gay, 19 Cal. 4th at

28  798.

Nevertheless, a defendant has not suffered a due process violation unless state action denied him <u>access</u> to a competent psychiatrist and appropriate examination and assistance. <u>Harris</u>, 949 F.2d at 1516; <u>In re Gay</u>, 19 Cal. 4th at 798. In <u>Harris</u>, the Ninth Circuit found no constitutional violation "because the state did in fact provide Harris with psychiatric assistance. The state provided Harris with <u>access</u> to any competent psychiatrist of his choice when it gave Harris the funds to hire two psychiatrists from the general psychiatric community. The state did not limit Harris's access to psychiatric assistance in any way." 949 F.2d at 1516 (emphasis in original). The California Supreme Court has likewise held that where "the state bore no responsibility for the selection of [the evaluating psychiatrist], . . . petitioner may not claim entitlement to relief on the basis that he was denied a competent mental health expert." <u>In re Gay</u>, 19 Cal. 4th at 798.

Here, Dr. Bolger had previously interviewed Petitioner at the direction of the police and determined that Petitioner was competent. (J. Br. at 20 ¶ 41; Evid. Hr'g Ex. P34-A.) When the trial court suggested that Deere's competency be evaluated, the state suggested that the court appoint Dr. Bolger and inaccurately represented that Dr. Bolger was a "board certified" psychiatrist. (J. Br. at 25 ¶ 49.) The state, however, had also earlier provided Petitioner with adequate funds to retain psychiatrist(s) of his choosing. (<u>Id.</u> at 24, ¶ 48.) Attorney Jones made a request for "ancillary expenses" related to the "extensive psychological psychiatric examination of Deere" that "the proper defense of this case will require," and the court allocated $5,000.00 for that purpose. (<u>Id.</u>) Of that $5,000.00, Mr. Jones utilized only $1,696.86. (<u>Id.</u>)

While the Court does not find Dr. Bolger to be a competent psychiatrist and does not consider Dr. Bolger to have performed a competent evaluation (<u>see</u> <u>supra</u> pp. 32-33), Petitioner's failure to receive constitutionally adequate psychiatric assistance did not come at the hands of the state. The state allocated funds with which Petitioner could have secured an independent and adequate evaluation, (J.

Br. at 24, ¶ 48), and Petitioner's counsel knew that he "definitely could have asked for an independent examiner and one would have been appointed." (Evid. Hr'g Ex. R2-C at 158.) It was Petitioner's counsel who elected not to make better use of those funds, and who stipulated to the use of Dr. Bolger's evaluation while fully aware of his inadequacies and his prior evaluation at the state's direction. (J. Br. at 25 ¶ 48, 28-29 ¶ 54; Evid. Hr'g Ex. R3 at 55-58.) As in <u>Harris</u>, therefore, the state did not limit Petitioner's access to a constitutionally competent psychiatrist to conduct an appropriate examination and to assist in Petitioner's defense. Accordingly, Petitioner has failed to establish a right to relief on this basis. The Court **DENIES** Claim 3.

## III. Order

For the foregoing reasons, the Court hereby orders as follows:

1. Claim 3 of the First Amended Petition is **DENIED.**

2. Claims 1 and 4 of the First Amended Petition are **DISMISSED AS MOOT.**

3. The petition for writ of habeas corpus is **GRANTED** on the basis of Claim 6(b) and (c), and the judgment of conviction and sentence of death in the matter of <u>People v. Ronald Lee Deere</u>, Case No. ICR-7552 in the California Superior Court for the County of Riverside shall be **VACATED.**

**IT IS SO ORDERED.**

Dated: May 11, 2010.

_Christina A. Snyder_
CHRISTINA A. SNYDER
United States District Judge